IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **Jabil Inc.,**<br><br>   **Plaintiff,**<br><br>**v.**<br><br>**General Electric Company,**<br><br>   **Defendant.** | Case No. _____ |

# COMPLAINT

Plaintiff Jabil Inc., formerly known as Jabil Circuit, Inc. ("Jabil")[1], by its undersigned attorneys, hereby files its Complaint against Defendant General Electric Company ("GE"), stating as follows:

## NATURE OF ACTION

1. Jabil brings this breach of contract action to recover the damages it incurred when GE left Jabil holding the bag for millions of dollars of useless and obsolete inventory.

---

[1] Jabil operated and existed as "Jabil Circuit, Inc." until September 22, 2017, when it changed its corporate name to "Jabil Inc."

2. Jabil provides electronic manufacturing services and solutions throughout the world, specializing in electronic design, production, and product management services for a range of industries.

3. On September 1, 2011, Jabil (then operating as Jabil Circuit, Inc.) contracted[2] with GE to perform manufacturing services to supply certain "Products" (as defined under the Supply Agreement), including, but not limited to, pyramid cabinet boards and pyramid power modules.

4. As contractually agreed, GE would provide Jabil "Forecasts" (as defined under the Supply Agreement) of GE's demand for the Products, the receipt of which would authorize Jabil to purchase the materials necessary to manufacture the Products and meet GE's production deadlines.

5. Following this familiar procedure, GE provided Jabil such a Forecast and subsequent Forecasts in 2014, upon which Jabil procured the raw materials necessary to meet GE's shifting demand based on Jabil's production lead times.

6. GE later slashed its projections, leaving Jabil on the hook for over $2.1 million in raw materials that are now obsolete and useless.

---

[2] A true and correct copy of the Supply Agreement between the parties is attached to this Complaint and incorporated herein by reference as **Exhibit 1**.

7. Even though GE is contractually bound to compensate Jabil for these materials and despite Jabil's repeated attempts to resolve this dispute and mitigate its damages, GE has failed to honor its contract with Jabil and remit payment for the cost of these materials.

8. GE has also refused to pay for or otherwise return to Jabil 55 completed power module units, causing Jabil nearly $200,000 in additional damages.

9. Jabil files this lawsuit to recover these damages and other damages caused by GE's various breaches, including its breaches of the Supply Agreement.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over Jabil's claims under 28 U.S.C. § 1332(a)(1) because Jabil's state of citizenship is different from GE's state of citizenship and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is appropriate in this District because both Jabil and GE consented to this venue in the Supply Agreement, agreeing that "[l]itigation may be brought only in the U.S. District Court for the Northern District of Georgia . . . ." (Supply Agreement, App. 2 at § 21.1).

12. Venue is also appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the

claim occurred in this District. GE's refusals to honor the Supply Agreement and to make payments thereunder emanated from its operations located in Atlanta, Georgia.

13. The Court may exercise personal jurisdiction over GE because GE expressly "submit[ted] to the jurisdiction" of this Court in the Supply Agreement. (Supply Agreement, App. 2 at § 21.1).

14. The Court also may exercise personal jurisdiction over GE pursuant to O.C.G.A. § 9-10-91 because it transacts business in the State of Georgia.

## THE PARTIES

15. Jabil is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Petersburg, Florida. Jabil provides electronic manufacturing services and solutions throughout the world, specializing in electronic design, production, and product management services for a range of industries.

16. GE is a corporation organized under the laws of the State of New York with its principal place of business in Boston, Massachusetts. GE may be served through its registered agent, CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia 30046-4805.

## FACTUAL ALLEGATIONS

**I.     The Supply Agreement.**

17.    On September 1, 2011, Jabil and GE entered into a written Supply Agreement wherein Jabil agreed to perform manufacturing services to supply certain Products, including, but not limited to, pyramid cabinet boards and pyramid power modules. (*See* Supply Agreement § 1(a)).[3]

18.    Under the Supply Agreement, GE and Jabil agreed that "[GE] or any of its 'Affiliates' . . . may purchase any or all of the goods set forth that [GE] has agreed to purchase from [Jabil] (collectively, the 'Products') during the Term of this Agreement at the prices agreed to in this Agreement. . . . All purchases under this Agreement are subject to the issuance of firm purchase orders ('POs' or 'Orders') by [GE] . . . ." (Supply Agreement § 1(a)).

19.    To minimize lead times and delays in the supply chain for the Products, GE and Jabil agreed that "[GE] shall provide [Jabil] a forecast that shall be updated by [GE], in writing, on a monthly or quarterly basis ('Forecast'). *Any rescheduling or cancellation of a Forecast shall be subject to the terms set forth in Section 6*

---

[3] GE and Jabil amended the Supply Agreement on August 31, 2014, November 30, 2014, March 2, 2015, June 30, 2015, Feb 5, 2016, June 30, 2016, June 30, 2017, and December 20, 2017.

*[Liability for Obsolete Raw Materials and Excess Raw Materials] below*. [GE] shall make Commercially Reasonable Efforts to provide [Jabil] with a Forecast covering twelve (12) months of [GE]'s Forecasted demand." (Supply Agreement § 1(b) (emphasis added)).

20. Though a "Forecast may not reflect [GE]'s actual requirements *for Products*" and is no guarantee for the "number of Products that [GE would] purchase from [Jabil]," GE and Jabil both agreed that "*the Forecast shall be an authorization for [Jabil] to purchase Components . . . and materials*, including any minimum quantities, as necessary to fulfill the Forecast on a current Component lead time plus manufacturing lead time basis. [Jabil] shall place orders with Component suppliers for quantities no greater than is reasonably necessary to meet Buyer's Forecast." (Supply Agreement § 1(c) (emphasis added)).

21. GE and Jabil also agreed that GE would compensate Jabil should GE reduce its Forecasts for Products after Jabil had already purchased components and other raw materials to fulfill a Forecast on a timely basis. (*See generally* Supply Agreement §§ 6(a)–(b)).

22. Under Section 6 of the Supply Agreement, titled "Liability for Obsolete Raw Materials and Excess Raw Materials," GE and Jabil agreed that "[Jabil] may have Obsolete Raw Materials . . . in inventory or on order for a particular [GE] site

6

from time to time as a consequence of, for example, engineering or material change orders, demand cancellation, the termination of this Agreement, or the endoflife of a raw material." (Supply Agreement § 6(a)). The Supply Agreement defines "Obsolete Raw Materials" as "those raw materials in inventory or on order that no longer appear on a [GE] bill of material for the Products, or which appear on a bill of materials for a Product for which [GE] has no purchase order or forecast demand during the next ninety (90) days." *Id.*

23. GE and Jabil agreed that "[u]pon [Jabil] notifying [GE] of the existence of Obsolete Raw Materials, [GE] will . . . have the option of within three (3) weeks of the date of [Jabil's] notice of either placing new purchase order demand that will consume the Obsolete Raw Materials within ninety (90) days or remitting a payment to [Jabil] in accordance with the payment terms in this Agreement: (i) the quoted cost of the Obsolete Raw Materials, which shall be supported by documentation, plus (ii) [Jabil]'s previously quoted material overhead costs allocated to the Obsolete Raw Materials. Any Obsolete Raw Materials paid for by [GE] under this Section will be shipped by [Jabil] at [GE's] direction, risk and cost." (Supply Agreement § 6(a)).

24. GE's liability under Section 6 of the Supply Agreement is subject to Jabil:

> (i) having purchased the Obsolete Raw Materials, Excess Raw Materials or any other materials only in support of [GE] Purchase Orders or in accordance with [GE]'s Forecasts (plus any minimum or economic order quantity purchase requirements) and no sooner than reasonably appropriate to meet [GE] delivery requirements; (ii) not having made production arrangements or produced workinprogress or inventory in excess of the amount, or in advance of the time, necessary to meet [GE]'s delivery schedule and consigned inventory requirements, and (iii) having used all reasonable efforts to mitigate any [GE] inventory liability.

(Supply Agreement § 6(c)). In addition, "[t]hese mitigation efforts will be made in consultation with and with the assistance of [GE] . . . ." *Id.*

25. GE and Jabil agreed that the "Agreement shall in all respects be governed by and interpreted in accordance with the substantive law of the State of New York, .S.A., excluding its conflicts of law provisions." (Agreement, App. 2 at § 20).

## II. GE's Breaches of the Supply Agreement.

26. In 2014, GE provided Jabil Forecasts of its demand for certain pyramid power modules and pyramid cabinet boards.

27. On receipt of the Forecasts and as authorized under the Supply Agreement, Jabil purchased only those Raw Materials necessary to timely fulfill GE's demand as set forth in the Forecasts and in conjunction with Jabil's production lead times.

28. After Jabil purchased the Raw Materials necessary to fulfill the Forecasts, GE slashed its demand for the Products, ultimately rendering the $2,128,992.91 of the materials that Jabil had purchased Obsolete Raw Materials under the Supply Agreement. (*See* Supply Agreement § 6(a)).

29. Jabil provided GE notice of the Obsolete Raw Materials and supporting documentation as to their cost, but GE has refused to remit to Jabil the amount of $2,128,992.91.

### III. GE's Refusal to Return Power Modules.

30. In addition, Jabil delivered 354 power module units to GE pursuant to specified Purchase Orders made under the Supply Agreement.

31. After Jabil delivered these power modules to GE, the parties mutually agreed that GE was to return all 354 power module units to Jabil.

32. Despite agreeing to return all 354 units, GE has either failed or refused to return 55 of the 354 units.

33. GE has not compensated Jabil for the 55 power module units it retained under the Purchase Orders and Supply Agreement.

34. Jabil repeatedly demanded that GE honor the Supply Agreement and Purchase Orders and compensate Jabil for—or, in lieu of compensating, returning—the 55 power module units, but GE refused to do so.

35. The agreed price for each power module is $3,495.00. (*See* Supply Agreement § 1(a)).

36. Jabil has thus suffered $192,225.00 in damages as a result of GE's failure to compensate Jabil for or otherwise return these 55 power module units to Jabil.

### IV. GE's Recent Conduct.

37. Jabil has since consistently cooperated with GE to resolve this dispute and to mitigate Jabil's damages, including responding to GE's audit and forecast information requests and engaging in over 30 conference calls, meetings, and other discussions dating back to 2015.

38. For instance, following a December 6, 2018 meeting with GE and responding to additional GE requests for information, Jabil sent GE a letter dated December 20, 2018, documenting the cost of the Obsolete Raw Materials and Jabil's other damages and demanding full payment of the amount owed.

39. In response to Jabil's December 20, 2018 letter, GE again refused to honor the Supply Agreement and to compensate Jabil for the damages Jabil has suffered.

40. Jabil sent GE another letter dated January 28, 2019 documenting Jabil's damages and demanding full payment of the amount owed, but GE again refused to

honor the Supply Agreement and to compensate Jabil for the damages Jabil has suffered.

41. Jabil continues to incur costs by holding and maintaining the Obsolete Raw Materials for delivery to GE. (*See* Supply Agreement § 6(a)).

42. Due to GE's failure to honor the Supply Agreement and to work with Jabil in good faith to remit the full payment for the unreturned power modules and Obsolete Raw Materials, Jabil has incurred additional damages resulting from GE's additional breaches of the Supply Agreement.

43. At all times material hereto, Jabil has performed its obligations in the manner specified in the Supply Agreement and satisfied all preconditions to recovery.

## CLAIMS FOR RELIEF

### Count 1
### (Breach of Contract)

44. Jabil re-alleges and incorporates by reference all of the preceding paragraphs and allegations of the Complaint as though fully set forth herein.

45. The Supply Agreement that GE and Jabil executed on September 1, 2011 is a valid, binding contract between GE and Jabil.

46. GE rendered the materials that Jabil had purchased to timely fulfill GE's Forecasted demand Obsolete Raw Materials under the Supply Agreement. (*See* Supply Agreement § 6(a)).

47. GE was obligated under the Supply Agreement to either place a new Purchase Order that would consume the Obsolete Raw Materials in Jabil's inventory or remit payment to Jabil for the quoted cost of the Obsolete Raw Materials and overhead allocated thereto. (Supply Agreement § 6(a)).

48. Jabil demanded that GE honor the Supply Agreement and compensate Jabil for Obsolete Raw Materials, but GE refused to do so.

49. GE's refusal to do so constitutes a breach of the Supply Agreement.

50. Jabil stands ready under the Supply Agreement to ship "[a]ny Obsolete Raw Materials paid for by [GE]" but continues to incur additional damages resulting from GE's breach of the Supply Agreement. (Supply Agreement § 6(a)).

51. Jabil has incurred damages in an amount to be proven at trial resulting from GE's breach.

52. Jabil is also entitled to recover pre- and post-judgment interest at a rate of nine per centum per annum under N.Y. C.P.L.R. §§ 5001 and 5004.

## Count 2
## (Breach of Contract)

53.     Jabil re-alleges and incorporates by reference all of the preceding paragraphs and allegations of the Complaint as though fully set forth herein.

54.     The Supply Agreement that GE and Jabil executed on September 1, 2011 is a valid, binding contract between GE and Jabil.

55.     Under the Supply Agreement, GE is obligated to "purchase any or all of the goods set forth that [GE] has agreed to purchase from [Jabil] . . . at the prices agreed to in this Agreement." (Supply Agreement § 1(a)).

56.     Pursuant to the Supply Agreement and certain Purchase Orders made thereunder, Jabil manufactured and supplied GE with 354 power module units.

57.     GE and Jabil later agreed that GE would return all 354 power module units to Jabil.

58.     To date, GE has returned only 299 power module units to Jabil and has not compensated Jabil for the remaining 55 power module units it retained.

59.     Jabil demanded that GE honor the Supply Agreement and Purchase Orders and compensate Jabil for—or, alternatively, return—the 55 power module units, but GE refused to do so.

60.     GE's refusal to return the 55 power module units or to compensate Jabil for them constitutes a breach of the Supply Agreement.

61. Jabil has incurred damages in an amount to be proven at trial resulting from GE's breach.

62. Jabil is also entitled to recover pre- and post-judgment interest at a rate of nine per centum per annum under N.Y. C.P.L.R. §§ 5001 and 5004.

## Count 3
### (Breach of the Covenant of Good Faith and Fair Dealing)

63. Jabil re-alleges and incorporates by reference all of the preceding paragraphs and allegations of the Complaint as though fully set forth herein.

64. The Supply Agreement that GE and Jabil executed on September 1, 2011 is a valid, binding contract between GE and Jabil.

65. The covenant of good faith and fair dealing attaches to GE's performance and obligations under the Supply Agreement, including, but not limited to: (a) making and revising Forecasts; (b) placing Purchase Orders; and (c) working with Jabil with respect to Obsolete Raw Materials. (*See* Supply Agreement §§ 1(a)–(c), 6(c)).

66. GE sought to prevent its performance under the Supply Agreement and to withhold from Jabil the benefits of the Supply Agreement by:

    a. Failing make or revise the Forecasts in good faith;

    b. Failing to place Purchase Orders under the Supply Agreement in good faith.

      c.    Failing to work with Jabil with respect to the Obsolete Raw Materials in good faith.

67. Jabil stands ready under the Supply Agreement to ship "[a]ny Obsolete Raw Materials paid for by [GE]" but continues to incur additional damages resulting from GE's breaches of the Supply Agreement. (Supply Agreement § 6(a)).

68. Jabil demanded that GE honor the Supply Agreement and compensate Jabil for its damages, but GE refused to do so.

69. GE's conduct constitutes breaches of the covenant of good faith and fair dealing under the Supply Agreement.

70. Jabil has incurred damages in an amount to be proven at trial resulting from GE's breaches.

71. Jabil is also entitled to recover pre- and post-judgment interest at a rate of nine per centum per annum under N.Y. C.P.L.R. §§ 5001 and 5004.

## **PRAYER FOR RELIEF**

Jabil respectfully requests that the Court enter a judgment against GE, as follows:

A. A judgment in Jabil's favor and against GE on all of Jabil's claims against GE;

B.    An award to Jabil of compensatory damages, including interest, in an amount to be proven at trial;

C.    An award of attorneys' fees and costs, as allowed by law;

D.    An award of prejudgment and post judgment interest, as provided by law; and

E.    Such other relief as the Court deems appropriate under the circumstances.

[Signature on Following Page]

Dated: May 17, 2019					Respectfully submitted,

/s/ *David B. Carpenter*

Kristine McAlister Brown
Georgia Bar No. 480189
David B. Carpenter
Georgia Bar No. 292101
Alan F. Pryor
Georgia Bar No. 101888
Caroline Gieser
Georgia Bar No. 167916

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
T: (404) 881-7000
F: (404) 881-7777
kristy.brown@alston.com
david.carpenter@alston.com
alan.pryor@alston.com
caroline.gieser@alston.com

*Counsel for Plaintiff Jabil Inc., formerly known as Jabil Circuit, Inc.*