**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **Jabil Inc.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) Case No. 1:19-cv-02260-LMM |
| **General Electric Company,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| _____ | ) |

**PLAINTIFF JABIL INC.'S BRIEF IN SUPPORT OF**
**<u>ITS MOTION FOR SUMMARY JUDGMENT</u>**

Kristine McAlister Brown
Georgia Bar No. 480189
David B. Carpenter
Georgia Bar No. 292101
Alan F. Pryor
Georgia Bar No. 101888

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
T: (404) 881-7000
F: (404) 881-7777
kristy.brown@alston.com
david.carpenter@alston.com
alan.pryor@alston.com

*Counsel for Plaintiff Jabil Inc.*

## I.    <u>INTRODUCTION</u>

This matter involves a simple dispute over a Supply Agreement between Jabil Inc. and General Electric Company.  Jabil seeks to recover damages it incurred when GE (1) breached its obligations under the Supply Agreement by refusing to pay for materials that Jabil purchased in support of GE forecasts; and (2) breached its obligations under a Settlement Agreement by failing to return certain products to Jabil.  By this Motion, Jabil shows that it is entitled to judgment as a matter of law both on these claims and to its damages.

*First*, the Supply Agreement authorizes Jabil to purchase materials in reliance on GE's representations of its expected future demand for products, referred to as "Forecasts."  This allows Jabil to stand ready to assemble those products when—and in the quantities that—GE needs them.  If GE later decides not to submit orders to purchase any products, it is required under the Supply Agreement to compensate Jabil for procuring those materials.  Here, the indisputable evidence shows that Jabil prudently procured materials to meet GE's Forecasted demand.  It also shows that, when GE's orders for those products did not materialize, Jabil took the necessary reasonable measures to engage GE and otherwise mitigate liability.  Even though Jabil continues incurring damages by holding this inventory for GE, GE refuses to compensate Jabil for its damages.

***Second***, the undisputed facts also show that Jabil had previously delivered to GE 354 products dubbed "Pyramid Power Modules." The parties executed a Settlement Agreement requiring GE to return all 354 Pyramid Power Modules to Jabil. GE, however, only returned 299 of them. Despite its clear obligation to do so, GE refuses to compensate Jabil for its failure to return 55 of Jabil's products.

***Third***, the undisputed facts show that GE has no viable defenses to any of Jabil's claims as a matter of law and that there is no genuine dispute on the amount of Jabil's damages. The Court should grant summary judgment in Jabil's favor on all its claims and award it the damages to which it is entitled.

## II. <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

### A. **The Parties**

Jabil is a manufacturing services company that provides electronic and diversified manufacturing services and solutions throughout the world. Declaration of Avis Mullen ¶ 2, attached to the Statement of Undisputed Materials Facts ("SUMF") as **Exhibit P** ("Mullen Dec."). GE is a manufacturing company operating in industries like aviation, gas, and, of note here, power and energy production. Deposition of GE's 30(b)(6) Representative at 37:11-17, attached to the SUMF as **Exhibit Q** ("GE Dep."). During the times relevant to this matter, the overarching contractual relationship between Jabil and GE was governed by a Supply Agreement

executed on September 1, 2011.[1]  GE Dep. 38:9-39:14, 63:6-12, 63:25-64:14; GE

Dep. Ex. 2, attached to the SUMF as **Exhibit R**.  The Supply Agreement applied to

and governed each of GE's business units and divisions that transacted business with

Jabil.  GE Dep. 38:9-39:14, 63:6-12, 63:25-64:14.

### B.    The Supply Agreement

The Supply Agreement provided the framework through which Jabil was to

manufacture certain products for GE over the course of the parties' contractual

relationship.  GE Dep. 62:6-63:5.  GE and Jabil agreed that

> [GE] . . . *may* purchase any or all of the goods set forth that [GE] has
> agreed to purchase from [Jabil] (collectively, the 'Products') during the
> Term of this Agreement at the prices agreed to in this Agreement. . . .
> All purchases under this Agreement are subject to the issuance of firm
> purchase orders ('POs' or 'Orders') by [GE] . . . .

Supply Agreement § 1(a) (emphasis added).  The Supply Agreement did not identify

any specific "Product" that Jabil was to supply to GE, and GE would purchase

various "Products" from Jabil only by issuing purchase orders for those Products.

Supply Agreement § 1(a); GE Dep. 76:19-77:24.  The Supply Agreement thus

applied to a range of projects and products in addition to the Pyramid Project

---

[1] Since 2011, the Supply Agreement periodically was amended to extend the term
of the agreement. These amendments have not altered the terms relevant to this
matter. GE Dep. 64:20-71:11 & Exs. 3–11, attached to the SUMF as composite
**Exhibit S**.

3

discussed in this matter.[2]  GE Dep. at 62:6-63:12.  In this way, the parties set the core terms governing their relationship while allowing the flexibility to pursue various projects over the course of that relationship.  *Id.* at 62:6-63:12, 63:25-64:14, 76:19-77:24.

To minimize lead times and delays in the supply chain for products, the parties agreed that "[GE] ***shall*** provide [Jabil] a forecast that shall be updated by [GE], in writing, on a monthly or quarterly basis ('Forecast')".  Supply Agreement § 1(b) (emphasis added).  These Forecasts "[authorized Jabil] to purchase Components . . . and materials as necessary to fulfill the Forecast on a current Component lead time plus manufacturing lead time basis."  Supply Agreement § 1(c).

The Supply Agreement states, however, that a "Forecast may not reflect [GE]'s actual requirements for Products."  Supply Agreement § 1(c).  In fact, there is no promise of a "guaranteed number of Products that [GE would] purchase from [Jabil]" or even that GE would purchase ***any*** products from Jabil.  Supply Agreement

---

[2] Until recently, across all of GE's business units, Jabil and GE conducted business numbering in the tens of millions of dollars annually.  GE Dep. 51:23-53:7.  GE's Power Conversion business unit—which was responsible for the Pyramid project—conducted about $3 million of business with Jabil annually until around 2018.  *Id.* at 50:11-51:6.  The Pyramid Project represented a fraction of GE Power Conversion's business with Jabil and did not represent Jabil's largest project with GE's Power Conversion business unit.  *See id.*

§ 1(c).  Accordingly, as GE's corporate representative testified, even if GE had selected a supplier for a particular project, it continued to reassess its supplier options and could at its discretion substitute suppliers.  GE Dep. 39:15-43:25.

To safeguard against these risks, the Supply Agreement required GE to compensate Jabil for materials that Jabil purchased in response to a Forecast should GE reduce its demand or not place a purchase order for the Products.  Supply Agreement §§ 6(a)–(b).  The Supply Agreement defines: (1) "Excess Raw Materials" as materials in Jabil's inventory that have aged for more than ninety days from receipt and (2)  "Obsolete Raw Materials" as materials in Jabil's inventory or on order that either no longer appear on GE's Bill of Materials or for which GE has no purchase order or Forecast demand for the next ninety days.  *Id.* §§ 6(a), (b).  Once Jabil notified GE that Jabil had Obsolete Raw Materials in its inventory:[3]

> [GE] will, subject to [Jabil] having complied with [Section 6(c)], have the option of within three (3) weeks of the date of [Jabil's] notice of either placing new purchase order demand that will consume the Obsolete Raw Materials within ninety (90) days or remitting a payment to [Jabil] in accordance with the payment terms in this Agreement: (i) the quoted cost of the Obsolete Raw Materials, which shall be supported by documentation, plus (ii) [Jabil]'s previously quoted material overhead costs allocated to the Obsolete Raw Materials.

---

[3] There is no dispute that all of the materials remaining in Jabil's inventory at issue in this lawsuit constitute Obsolete Raw Materials.  Deposition of Avis Mullen 167:3-22, 168:25-169:7, attached to the SUMF as **Exhibit T** ("Mullen Dep.").

Supply Agreement § 6(a).  In return, Jabil was required to ship any such Obsolete Raw Materials paid for by GE "at [GE's] direction, risk and cost."  *Id.*  In short, if GE does not issue a purchase order to consume the Obsolete Raw Materials in Jabil's inventory, GE is required to pay Jabil for them.

In order to recover the costs for Obsolete Raw Materials, Jabil could only procure materials in "quantities no greater than is reasonably necessary to meet [GE's] Forecasts" and "no sooner than reasonably appropriate to meet [GE's] delivery requirements."  Supply Agreement §§ 1(c), 6(c).  In addition, Jabil was required to use "all reasonable efforts to mitigate any [GE] inventory liability."  *Id.* § 6(c).  Jabil was to make these mitigation efforts "in consultation with and with the assistance of [GE], in its discretion," specifically, "using raw materials on non[GE] projects, returning components to suppliers, restocking components with suppliers, or canceling orders with suppliers."  *Id.*

C.   **Jabil's Purchase of the Materials to Meet GE's Forecasts for the Pyramid Project**

In October 2013, GE selected Jabil to manufacture products called "Pyramid Power Modules"[4] and "Pyramid Cabinet Boards" (collectively, the "Pyramid

_____

[4] Pyramid Power Modules are also referred to as MV4 Modules.  *See* GE Dep. 9:22-10:4.

Products") ("Pyramid Project").  GE Dep. 75:20-22; GE Dep., Ex. 38, attached to the SUMF as **Exhibit U**.  GE issued a Bill of Materials ("BOM") and Approved Vendors List ("AVL"), specifying the materials needed to assemble the Pyramid Products and the vendors approved to provide those materials.  Mullen Dep. 338:5-19; Mullen Dec. ¶¶ 11-12; SUMF **Exhibits A** and **B**.

By no later than December 2013, in accordance with the terms of the Supply Agreement, GE had issued its first Forecast[5] for the Pyramid Products to Jabil. Mullen Dep. 85:13-19; Mullen Dec. ¶ 13; SUMF **Exhibit C**.  Due to its shifting demand, GE routinely modified its Forecast throughout 2014 and into 2015, altering both the quantity and timeline for its Forecasted demand for Pyramid Products. Mullen Dec. ¶¶ 18, 28; SUMF Ex. C.  For its part, GE currently does not know whether or not it issued any Forecasts to Jabil prior to October 2014.  GE Dep. 91:19-92:4.

---

[5] Jabil no longer has in its possession the original Forecasts that it received from GE, a fact that GE has contended precludes Jabil from recovering in this matter. But as discussed in detail below, Jabil tracked and maintained the Forecast data in its SAP system. And, as detailed in the accompanying declaration of Avis Mullen, the SAP data at a minimum constitutes evidence of the Forecast data under Federal Rule of Evidence 1004. *See* Mullen Dec. ¶¶ 13-27.

1.    GE's Forecast Data and Jabil's SAP System

Jabil managed the Forecasts, including any revisions or modifications to them, and fulfilled its procurement obligations under the Supply Agreement through an enterprise resource planning software system commonly referred to as "SAP."[6] Mullen Dep. 32:22-33:9, 43:21-44:16; Mullen Dec. ¶¶ 15-16, 32; Deposition of Scott Gebicke at 41:18-23, 44:14-24, attached to the SUMF as **Exhibit V** ("Gebicke Dep."). Jabil's SAP system manages Jabil's core business processes, such as Jabil's procurement, production, and materials management. Mullen Dep. 32:22-9, 41:2-9; Gebicke Dep. 41:18-23. Jabil's SAP system stores a range of data, including, but not limited to: forecast data, forecast revision or modification data, purchase order data from customers, materials and manufacturing lead time data, shipping dates, supplier minimum order quantity data, materials inventory (including excess and obsolete materials inventory) data, pricing and purchasing requirements data, and customer BOM and AVL data. Mullen Dep. 41:2-9, 47:3-48:3, 53:3-10, 54:22-55:3, 59:23-60:17, 338:5-339:10; Mullen Dec. ¶¶ 11, 12, 20, 31, 38; Gebicke Dep. 44:4-24. Using its SAP software, Jabil maintains a just-in-time inventory system so that

---

[6] Most global manufacturers and suppliers, including GE, employ similar enterprise resource planning software systems to manage their procurement, production, and materials management functions. GE Dep. 81:22-82:16.

Jabil procures materials only as they are needed to meet the forecasted demand for a product.  Gebicke Dep. 77:14-20, 180:17-181:7.  Jabil audits its SAP system annually, and its SAP system was awarded an ISO certification that it manages Jabil's business processes effectively and accurately.  Mullen Dec. ¶ 17; Gebicke Dep. 49:4-50:7, 179:20-180:16.

Jabil implemented processes to confirm the Forecast data GE submitted for the Pyramid Project.  Mullen Dep. 51:3-52:5; Gebicke Dep. 154:2-155:3.  Once Jabil received a Forecast from GE, it was Jabil's pattern and practice to confirm with GE receipt of and the data contained in the Forecast.  Mullen Dec. ¶¶ 15, 16, 20; Mullen Dep. 44:6-16, 51:3-52:5.  Once the Forecast data was confirmed, Jabil converted the Forecast into a data file to upload into SAP.  Mullen Dec. ¶ 16; Mullen Dep. 43:21-44:23, 51:3-52:5.  It was also Jabil's pattern and practice to then verify the SAP data against the Forecast and notify GE once the process was completed.  Mullen Dep. 51:3-52:5. Specifically, Jabil's corporate representative testified as to this receipt, confirmation, and verification process with GE:

> And every week there is a meeting between whenever we receive a forecast between GE and Jabil.  Present are the planner, the site BU and the personnel on the GE side.  The forecast is reviewed in whatever format it comes in in (sic).  And that is discussed extensively as to any changes from the previous forecast that had been received, which is printed out, the report from SAP.
>
> . . . .

> So once we get the forecast from the customer and agree that the changes that they have requested are real changes, because sometimes there is errors coming from the customer. So once we verify on a call with our planner, our BU and obviously GE, we then take that forecast and it is uploaded into SAP where we run an MPS report from SAP and that's verified against the forecast into a correctness and then provided back to -- to the customer.

Mullen Dep. 44:8-16, 51:9-18.

Once GE's Forecast data—or Forecast revision or modification data—for the Pyramid Products was uploaded, Jabil's SAP automatically assessed the future demand date and quantity of the Pyramid Products.  Mullen Dec. ¶ 32; *see also* Mullen Dep. 55:15-56:3, 70:9-71:4; Gebicke Dep. 76:5-14.  Using GE's BOM and AVL, the SAP issued purchase requisitions for materials only as necessary to meet the Forecasted date and quantity for the Products.[7]  Mullen Dec. ¶ 32; *see also* Mullen Dep. 70:9-71:4, 338:5-13; Gebicke Dep. 44:15-18, 68:7-69:25, 76:5-14.  In accordance with the terms of the Supply Agreement, SAP then directed Jabil's purchasing team to place orders for the materials in accordance with: (1) component lead times (the time vendors require to produce or procure the ordered materials) issued by approved vendors; and (2) Jabil's manufacturing lead times (the amount

---

[7] The manufacturing lead time was 14 days for Pyramid Cabinet Boards but was 30 days for the Pyramid Power Modules.  Mullen Dep. 63:19-64:14.

of time needed in-house to assemble a particular Pyramid Product).  Mullen Dec. ¶ 32; *see also* Mullen Dep. 64:9-64:14, 67:23-68:2, 70:9-71:4; Gebicke Dep. 68:18-69:25, 77:14-20, 180:17-181:7.  The data on Jabil's SAP system also is used to generate Excess & Obsolete Reports, identifying excess or obsolete raw materials in Jabil's inventory for a given project.  Mullen Dep. 40:23-41:9, 53:17-56:4; Gebicke Dep. 56:3-9.  In short, one need only look at Jabil's SAP data to determine that Jabil procured the Obsolete Raw Materials in compliance with the Supply Agreement and to confirm that the Obsolete Raw Materials qualify as such under the Supply Agreement.

### 2. GE's Shifting Forecasted Demand and Ultimate Suspension of the Pyramid Project

As GE continued to revise its Forecast throughout 2014, it both increased the quantity and shortened the time frame of its Forecasted demand for the Pyramid Products.[8]  Mullen Dec. ¶ 28; SUMF Ex. C.  At the peak of GE's Forecasted demand in July 2014, GE's Forecast indicated demand for the full quantity of the Pyramid Products by the close of 2014 and with a substantial portion of the Products due by

---

[8] Additionally, many of the materials used to assemble the Pyramid Products carried long lead teams—sometimes numbering in the hundreds of days—that put additional pressure on GE's truncated, Forecasted timeline.  Mullen Dep. 215:23-216:21, 323:12-326:5; Mullen Dec. ¶ 30; SUMF **Exhibit D, "**High Water Mark – Top 20," at Column G.

the end of the month.   Mullen Dec. ¶ 29; SUMF Ex. C.   Using the applicable component lead times and Jabil's manufacturing lead times, Jabil procured materials at that time but only as necessary to meet GE's Forecasted quantity and time frame. Mullen Dec. ¶ 32.

Near the end of August 2014, the parties agreed for Jabil to move its dedicated assembly line for the Pyramid Power Modules from Guadalajara, Mexico, to Auburn Hills, Michigan.   Mullen Dep. 39:1-8.   The assembly line for the Pyramid Cabinet Boards remained in Guadalajara.   *Id.*   Once the assembly line for the Pyramid Power Modules was operational in Auburn Hills, GE issued another Forecast in October 2014 for the Pyramid Products ("October 2014 Forecast").   Mullen Dep. 80:13-14; GE Dep. Ex. 31, attached to the SUMF as **Exhibit W**.   The October 2014 Forecast, however, both reduced the quantity of and delayed the timeline for GE's Forecasted demand.   *Compare* SUMF Ex. C, *with* SUMF Ex. W; Mullen Dep. 100:10-19.   In January 28, 2015, GE issued another Forecast for Pyramid Products for 2015 and 2016 ("January 2015 Forecast"), which further delayed GE's expected demand for any Pyramid Product until no earlier than September 2015.   Mullen Dep. Ex. 15, attached to the SUMF as **Exhibit X**.

GE never issued another purchase order for Pyramid Power Modules.   GE Dep. 74:22-24, 122:2-5; Mullen Dep. 196:23-197:7.   With no forthcoming purchase

orders for Pyramid Power Modules, Jabil's dedicated assembly line—and personnel assigned to that line—for the Pyramid Power Modules sat idle for months.  Mullen Dep. 193:8-195:13.  Jabil notified GE that it could not continue maintaining an idle assembly line and personnel unless GE issued a purchase order or compensated Jabil for out-of-pocket expenses for holding the line and personnel in place.  Mullen Dep. 194:20-195:5, 203:17-204:3.   Ultimately, in November 2015, "with no forward looking plan from GE," Jabil reassigned the assembly line and personnel to other projects in Auburn Hills.  GE Dep., Ex. 22, attached to the SUMF as **Exhibit Y**; Gebicke Dep. 193:11-194:13.  GE suspended the entire Pyramid Project and never brought the Pyramid Products to market.[9]  GE Dep. 46:18-47:9.

### 3.  Jabil's Efforts to Engage GE

Throughout the Pyramid Project, Jabil and GE held regularly scheduled meetings—and held additional, more informal discussions almost daily—to discuss various aspects of the Pyramid Project.  Mullen Dep. 319:9-323:9.  Not only did Jabil have regular interactions with GE to specifically confirm its receipt and the

---

[9] Nevertheless, Jabil offered its New Products Introduction (or "NPI") team to assist GE should it decide to relaunch the Pyramid Project.  SUMF Ex. Y.  GE never sent Jabil a formal notice that it was in material breach of the Supply Agreement because of Jabil's November 10, 2015 correspondence.  GE Dep. 143:15-20, 144:11-13; *compare* GE Dep. Ex. 16, attached to the SUMF as **Exhibit Z.**

accuracy of the Forecast data that GE submitted, but Jabil also held quarterly business review meetings with GE to discuss open items regarding the Pyramid Project, including any Excess and Obsolete Raw Materials that Jabil had in its inventory.  *Id.*   Jabil also provided GE reports of Jabil's excess and obsolete inventory on a quarterly basis up until early 2015.  Mullen Dep. 120:17-121:23, 132:13-133:13.

After GE issued the January 2015 Forecast, however, Jabil began holding weekly meetings with GE to discuss open commercial items for the Pyramid Project, including Jabil's Excess and Obsolete Raw Material inventory in light of GE's delayed time frame for its Forecasted demand for Pyramid Products.  Mullen Dep. 74:17-75:9. Jabil also shared an "action tracker" with GE weekly, which listed all open commercial items regarding the Pyramid Project, including any Excess and Obsolete Raw Materials in Jabil's inventory.  Mullen Dep. 75:24-76:12, 190:7-22, 320:21-321:9.  The parties continued to discuss these commercial options into 2018. Mullen Dec. ¶ 35; *see also* Mullen Dep. 188:1-190:4; SUMF composite **Exhibits E through G**, SUMF **Exhibit H**.  And this is not a new process: Jabil has employed the same process to successfully resolve commercial claims for excess and obsolete inventory with both Jabil's other customers and GE.  Gebicke Dep. 150:11-156:19;

GE Dep. 48:9-49:10, 53:21-57:23. Despite these efforts, GE nevertheless rejected Jabil's commercial claims for the Obsolete Raw Materials.  GE Dep. 182:24-183:1.

GE also spurned Jabil's concerns regarding the design of the Pyramid Power Module.  In June 2015, Jabil alerted GE of six concerns with GE's design of the Pyramid Power Modules that risked device failure.  Mullen Dep. 195:14-196:18. Jabil considered these six concerns "major issue[s]" and "critical to quality" for its manufacturing process. *Id.* at 195:25-196:2.  Jabil requested that GE either change the design of the Pyramid Power Module to resolve these risks or to execute waivers for them. *Id.* at 195:14-24.  When GE did not respond to Jabil's request, Jabil reiterated its concerns in a September 1, 2015 email.  GE Dep. Ex. 18 through 20, attached to the SUMF as **Exhibits AA** through **AC**.  GE again did not execute the waivers, change the design of the Pyramid Power Modules, or acknowledge or investigate Jabil's concerns.  GE. Dep. 125:3-18, 126:9-15, 127:20-129:1, 130:14-131:16, 132:18-133:5.  Consequently, on December 7, 2015, Jabil notified GE that it could not move forward with the qualification of the Pyramid Power Modules and that GE should evaluate its other vendors for qualification and production.[10]  Mullen

---

[10] GE has continually argued that Jabil's purported refusal to manufacture additional Pyramid Power Modules absolves it of liability in this matter. As explained in detail below, GE's obligation to pay for Obsolete Raw Materials is a separate and distinct issue from suggestions that GE find a new supplier with no purchase orders pending.

Dep., Ex. 19, attached to the SUMF as **Exhibit AD**; Mullen Dep. 212:6-215:16.  GE never sent Jabil a formal notice that it was in material breach of the Supply Agreement as a result of Jabil's December 7, 2015 correspondence.   GE Dep. 136:24-137:5; *compare* GE Dep. Ex. 16, SUMF Ex. **Z**.

### 4.   Jabil Efforts to Reduce GE's Inventory Liability

With no additional purchase orders for Pyramid Power Modules forthcoming and as part of its ongoing discussions with GE, Jabil also sought to reduce its Obsolete Raw Materials inventory and mitigate GE's inventory liability for the Pyramid Project.  Mullen Dec. ¶ 36; *see also* Mullen Dep. 67:7-68:12, 71:23-72:15. It did so by selling them to third parties, reallocating the Pyramid Project materials inventory for other Jabil projects, and cancelling orders where possible.  *Id.*  Jabil's SAP identifies Obsolete Raw Materials in its inventory, which may be used for other Jabil projects, and Jabil periodically posts its excess and obsolete inventory on which third party vendors can bid.  Mullen Dep. 54:23-55:3, 68:3-25; *e.g.*, Mullen Dec. ¶ 36; SUMF **Exhibit I**.  These efforts were successful.  Mullen Dep. 71:23-72:15; Mullen Dec. ¶ 37; SUMF Ex. I.  In all, Jabil successfully reduced its Pyramid Project materials inventory from about $2.6 million in December 2014 to the $2,128,992.91 of Obsolete Raw Materials remaining in Jabil's inventory today.  Mullen Dep. 71:23-72:15; Mullen Dec. ¶ 37; SUMF **Exhibits J** and **K**.

5.    Jabil Has Suffered—and Continues to Suffer—Damages

Mindful of its contractual obligations under Section 6(a) of the Supply Agreement that it must ship Obsolete Raw Materials to GE at GE's direction, risk and cost, Jabil continues to maintain the Obsolete Raw Materials in storage at both its Guadalajara and Auburn Hills sites.  Mullen Dec. ¶ 39; Supply Agreement § 6(a).  In doing so, Jabil continues to incur storage and carrying costs.  Mullen Dec. ¶ 39.

From January 1, 2016 through December 18, 2020, Jabil incurred $117,376.85 in storage costs for the Pyramid Inventory at its Guadalajara site and incurs additional storage costs at a rate of $64.77 per day.  Mullen Dec. ¶ 40.  In the same time frame, Jabil incurred $8,158.68 in storage costs for the Pyramid Inventory at its Auburn Hills site and incurs additional storage costs at a rate of $4.50 per day.  Mullen Dec. ¶ 41.  Jabil has also incurred carrying costs in being deprived of the use of its capital tied up in these Obsolete Raw Materials.  Mullen Dec. ¶ 42.  Jabil applies a weighted average cost of capital ("WACC") of 15%, compounded annually.  Mullen Dec. ¶ 42.  Applying Jabil's WACC to the Obsolete Raw Materials from January 1, 2016 through December 18, 2020 and compounding annually, Jabil has been deprived of a total of $2,133,278.96 in carrying costs and is being deprived of additional carrying costs at a rate of $1,530.26 per day.  Mullen Dec. ¶ 42.

### D.     GE's Unreturned Pyramid Power Modules

By July 2014, GE had issued three Purchase Orders for Pyramid Power Modules at a price of $3,495.00 each.  GE Dep. Exs. 13–15, attached to the SUMF as composite **Exhibit AE**.  Jabil assembled and delivered 354 of the ordered Pyramid Power Modules pursuant to the Purchase Orders between March and August 2014. Mullen Dep. 160:17-23; Mullen Dec. ¶ 44; SUMF composite **Exhibit L**. Afterwards, the parties executed a Settlement Agreement for the Pyramid Power Modules delivered under these three Purchase Orders, wherein GE agreed to return all 354 Pyramid Power Module units to Jabil for a credit.  Mullen Dep. 160:17-23; Mullen Dec. ¶ 45; GE Dep. Ex. 17, attached to the SUMF as **Exhibit AF**.  Although Jabil credited GE for 354 Pyramid Power Modules, to date GE has returned only 299 of the 354 pyramid power modules, leaving 55 units unreturned.   Mullen Dep. 160:17-23; Mullen Dec. ¶ 46; *compare* SUMF **Exhibit M**, Sheets "1023," "1024," "Guad," and "Scrap Units," *with id.*, Sheets "GE Test" and "Missing."  Accordingly, on January 5, 2015, Jabil issued two invoices in the amounts of $69,900.00 and $122,325.00 for the 55 unreturned power modules.   Mullen Dec. ¶ 47; SUMF composite **Exhibit N**.  These invoices remain unpaid.  Mullen Dec. ¶ 48.

**E.     Jabil's Final Efforts to Engage GE and Filing this Lawsuit**

Following a December 6, 2018 meeting with GE and responding to additional GE requests for information, Jabil sent GE a letter dated December 20, 2018, documenting the quantity, price, cost, and location of the Obsolete Raw Materials and Jabil's other damages.  GE Dep. 155:8-160:2; GE Dep. Exs. 24 through 33, attached to the SUMF as **Exhibits AG** through **AO** & SUMF Ex. W.  Nevertheless, GE refused to compensate Jabil either for the Obsolete Raw Materials or for the unreturned Pyramid Power Modules.  GE Dep. 174:21-175:17, 182:24-183:1.

After unsuccessfully attempting to resolve this dispute in early 2019, Jabil filed the instant lawsuit on May 17, 2019.  [Dkt. 1].  Jabil seeks to hold GE liable for its breaches of the Supply Agreement and of the Settlement Agreement and to recover the following four categories of damages:

(1) The cost of the Obsolete Raw Materials in Jabil's inventory: **$2,128,992.91**;

(2) The storage costs for the Obsolete Raw Materials while holding and maintaining them for delivery to GE: **$125,535.53**;

(3) The carrying costs incurred by Jabil by holding and maintaining the Obsolete Raw Materials for delivery to GE: **$2,133,278.96**; and

(4) The invoiced price of the 55 unreturned Pyramid Power Modules: **$192,225.00**.

Because there is no genuine issue of fact, Jabil is entitled to judgment as a matter of law not only as to liability but also for each of these categories of damages. In addition, Jabil is entitled as a matter of law to an award of prejudgment interest under C.P.L.R. §§ 5001(a) and 5004.

## III.   <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine only if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" only if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party has supported its motion, the nonmovant then bears the burden of showing that summary judgment is improper by coming forward with specific facts contradicting the movant's evidence to show a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A nonmovant "cannot create a genuine issue through evidence that is 'merely colorable' or 'not significantly probative.' Furthermore, a dispute over a fact will only preclude summary judgment if the dispute might affect the

outcome of the suit under the governing law.  But, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving party is proper." *Smith v. E-BackgroundChecks.com, Inc.*, 81 F. Supp. 3d 1342, 1355 (N.D. Ga. 2014) (internal quots. and cits. omitted).

## IV.   <u>ARGUMENT AND CITATION TO AUTHORITY</u>

"The essential elements of a cause of action to recover damages for breach of contract are (1) the existence of a contract, (2) the plaintiff's performance pursuant to the contract, (3) the defendant's breach of its contractual obligations, and (4) damages resulting from the breach." *Arnell Constr. Corp. v. N.Y.C. Sch. Constr. Auth.*, 144 A.D.3d 714, 715 (N.Y. App. Div. 2d Dep't 2016).  Based on the undisputed facts, each of these elements is met on all of Jabil's claims.

### A. Jabil Is Entitled to Summary Judgment on its Claim for Breach of the Supply Agreement for the Obsolete Raw Materials

#### 1.   <u>GE Breached Its Contractual Obligations to Jabil</u>

Jabil is entitled, as a matter of law, to recover the cost of the Obsolete Raw Materials that remain in Jabil's inventory. ***First***, the undisputed facts show that Jabil met its contractual obligations under the Supply Agreement, as it duly procured the Obsolete Raw Materials in "accordance with [GE]'s Forecasts" and "in quantities no greater than is reasonably necessary" and "no sooner than reasonably appropriate[.]"  Supply Agreement §§ 1(c), 6(c).  Indeed, Jabil's just-in-time

21

inventory system and SAP software forecloses any argument that Jabil failed to meet these procurement obligations.  Using Forecast data submitted by GE, Jabil's SAP automatically assessed the expected future demand date and quantity for the Pyramid Products set forth in the Forecast data and directed purchasing teams to place orders for materials in accordance with given supplier lead times and manufacturing lead times.  Mullen Dec. ¶ 32; *see also* Mullen Dep. 55:15-56:3, 70:9-71:4; Gebicke Dep. 76:5-14.   Given GE's increasingly demanding Forecast schedule and often substantial lead times, there is no genuine dispute that Jabil's purchases were reasonably necessary and no sooner than reasonably appropriate.[11]

*Second*, there is no dispute that GE's Forecasts lapsed, that no purchase orders to consume the materials at issue were forthcoming, and that the materials in Jabil's inventory had "appear[ed] on a bill of materials for a Product for which [GE] has no purchase order or forecast demand during the next ninety (90) days."  Supply Agreement § 6(a).  They therefore constituted Obsolete Raw Materials and triggered

---

[11] Although not material to resolving Jabil's motion for summary judgment, at the peak of GE's Forecasted demand, GE's Forecasts would have required approximately $4.1 million in materials to assemble the Pyramid Products.  Jabil's documentation shows that—over the entire life of the Pyramid Project—it only procured $3.8 million in materials and, further, successfully reduced and mitigated its inventory to the $2,128,992.91 in Obsolete Raw Materials that it seeks to recover in this lawsuit.

GE's payment obligations under Section 6(a) of the Supply Agreement.  Even though it was on notice of the existence of the Obsolete Raw Materials in Jabil's inventory, GE has refused to honor its obligations under Section 6(a) of the Supply Agreement and compensate Jabil for them.  It is therefore undisputed that GE has breached its obligations under the Supply Agreement.

*Third*, the undisputed facts similarly demonstrate that Jabil abided by the other material terms of the Supply Agreement, including Section 6(c), under which Jabil is to undertake certain mitigation efforts "in consultation with and with the assistance of [GE]" to reduce GE's inventory liability.  Supply Agreement § 6(c).  Consistent with the Supply Agreement, Jabil both notified GE of the existence of the Obsolete Raw materials and then continued to engage GE in an effort to mitigate any inventory liability.  Supply Agreement § 6(c) ("These mitigation efforts will be made in consultation with and with the assistance of [GE], in its discretion[.]").  GE responded by drawing Jabil into protracted commercial discussions: first to relaunch the Pyramid Project; then to place the Obsolete Raw Materials into consignment and eventually to purchase them; then to unexplained, months-long delays following Jabil's invitation to provide supporting documentation and possible audits of the Obsolete Raw Materials; and finally, without any other way to stall further, ultimately to outright refuse to compensate Jabil for the Obsolete Raw Materials.

SUMF Exs. E through H; GE Dep. 174:21-175:17, 182:24-183:1.[12]   Accordingly, because GE exercised its discretion and continued "consult[ing]" with Jabil to reduce its own inventory liability, Jabil satisfied its obligations under Section 6(c) of the Supply Agreement.[13]

Still, without any contractual obligation to do so, Jabil made the extra effort to further reduce GE's inventory liability.  Jabil's SAP identifies its Obsolete Raw Materials inventory to be offered for other projects and to third parties.  With these and other efforts, Jabil managed to reduce its inventory—and thereby mitigated GE's inventory liability—by approximately $500,000 from December 2014 to present. These efforts are more than sufficient to satisfy both the Supply Agreement and New York law.  *King Fook Jewellery Grp. v. Jacob & Co. Watches, Inc.*, No. 14-cv-742, 2016 U.S. Dist. LEXIS 197470, at *26–28 (S.D.N.Y. July 25, 2016) (concluding

---

[12] From these and the other facts in the record, the Court may also conclude that, as a matter of law, GE breached the covenant of good faith and fair dealing implied into the Supply Agreement and that this breach is a separate ground for liability against GE.

[13]  GE's argument that Jabil representatives provided differing figures and information as it worked to mitigate GE's inventory liability and resolve the issue over the Obsolete Raw Materials similarly fails.  Whatever interactions between the parties has no bearing on the actual data in Jabil's SAP system, which is regularly audited and has obtained an ISO certification for its accuracy.  Moreover, the parties' regular and consistent interactions and procedure to confirm the data in any Forecast GE issued to Jabil and uploaded into Jabil's SAP system further undermines any argument that Jabil's SAP data may be inaccurate.

that the plaintiff acted reasonably to mitigate its damages where it sold "a significant number of Defendant's products, thus mitigating not only its own damages but also Defendant's burden to repurchase those products."). Accordingly, any argument that Jabil failed to "use[] all reasonable efforts to mitigate any Buyer inventory liability" is unpersuasive and unsubstantiated. The Court should therefore conclude that, as a matter of law, Jabil is entitled to summary judgment on its claim against GE for the Obsolete Raw Materials and award Jabil $2,128,992.91 in damages in the amount of the uncompensated Obsolete Raw Materials.

2.   <u>Each of GE's Remaining "Defenses" Fails as a Matter of Law</u>

On June 26, 2020, Jabil moved for judgment on the pleadings, arguing that a number of GE's "Defenses" raised in its answer failed as a matter of law, including that GE's performance under the Supply Agreement is excused because Jabil materially breached the Supply Agreement by: (1) failing to provide products (Pyramid Power Modules) as specified by the Supply Agreement; (2) moving its manufacturing facilities or equipment from Auburn Hills to unauthorized locations; and (3) failing or refusing to meet GE's purported contract specifications for—or failing or refusing to assemble—the Pyramid Power Modules. General Electric Company's Objs. & Resps. to Jabil Inc.'s First Interrs. & Reqs. Prod. at Interr. No. 5, attached to the SUMF as **Exhibit AP** ("GE's ROG Responses"); GE's Answer,

Defenses and Counterclaim [Dkt. 6] ¶¶ 78, 82–84.  Drawing "all reasonable inferences" in GE's favor, the Court declined to hold that a selection of GE's Defenses failed as a matter of law "at this time."  Order [Dkt. 67], at 11, 15, 16, & 17.

Now, with discovery complete and the record developed, GE can point to no evidence that creates a genuine issue as to *any* of its Defenses.  To the contrary, the undisputed material facts show that each of GE's Defenses and arguments fails as a matter of law.[14]

***First***, these purported "breaches" do not allow GE to avoid paying Jabil for the Obsolete Raw Materials because the alleged breaches are immaterial as a matter of law.  A "party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs. v. Austin Drugs, Inc.*, 111 F.3d

---

[14] GE raised other defenses—that Jabil "fail[ed] to comply with the material purchase requirements of the Supply Agreement," "fail[ed] to provide the necessary notice of inventory required by the Supply Agreement," "procur[ed] equipment or components unauthorized by the Supply Agreement," and that "GE has not determined that Jabil used such efforts [to mitigate any Obsolete Raw Materials] as required by the Supply Agreement"—that do not constitute affirmative defenses, but rather merely assert that Jabil's affirmative claims fail on the merits.  GE's ROG Responses, at Nos. 5, 18.  These defenses fail because, as set forth above, there is no genuine dispute that Jabil is entitled to judgment as a matter of law on Jabil's affirmative claims and damages against GE.

284, 289 (2d Cir. 1997), corrected opinion at 1997 U.S. App. LEXIS 19795, at *14 (2d Cir. Apr. 10, 1997).  Under New York law, for a breach of a contract to be material, it must "go to the root of the agreement between the parties."  *Id.*

The undisputed material facts make clear that each of GE's arguments relates to a supposed shortcoming in manufacturing a discrete product (Pyramid Power Modules) under a single, discrete project for a discrete GE business unit.  But the purpose, or essence, of the Supply Agreement was ***not*** to manufacture the Pyramid Power Modules, or even to govern solely the Pyramid Project.  Rather, it was to establish and govern the entire multi-year, tens of millions of dollars commercial relationship between Jabil and GE and the supply process for fulfilling specific purchase orders.  Indeed, the parties first executed the Supply Agreement on September 1, 2011, years before GE issued the first Forecast for Pyramid Power Modules and the events at issue in this lawsuit.  Even after the events giving rise to this lawsuit, GE found it worthwhile to extend the term of the Supply Agreement ***seven*** times through June 30, 2018.  It is impossible to square these undisputed facts with GE's claims of material breach, particularly ones that were never noticed to Jabil.  *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 392 (S.D.N.Y. 1999) ("A breach is material if it defeats the object of the parties in making the contract and 'deprive[s] the injured party of the benefit that it justifiably

expected.' Where a breach is material, the party is justified in refusing to go on . . . because it can no longer derive a worthwhile benefit from its contractual relationship.") (internal cits. omitted); *Times Mirror Mags., Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 731 (S.D.N.Y. 2000).

*Second*, the undisputed material facts demonstrate that Jabil has committed no breach—material or otherwise—of the Supply Agreement.  The key point, and the one that GE cannot escape, is that each of GE's claims of breach first requires the issuance of a purchase order for Pyramid Power Modules.  Indeed, GE's corporate designee testified that it will not purchase any product under the Supply Agreement without first issuing a purchase order.  GE Dep. 72:12-15, 76:19-77:24; Supply Agreement § 1(a).  Accordingly, without the first step of a purchase order, not one of the contractual provisions at issue in GE's Defenses is triggered, and there is no "Product" to which they would apply (or which Jabil was unwilling or unable to assemble).  First and foremost, because the undisputed material facts confirm that GE issued no Purchase Order for Pyramid Power Modules beyond those resolved in the Settlement Agreement, GE's defense that Jabil failed to provide reliable Pyramid Power Modules fails.

These undisputed facts similarly show that any argument that Jabil breached the Section 7 of the Purchase Terms by moving manufacturing facilities for the

Pyramid Power Modules from Auburn Hills fails as a matter of law.  Section 7 of the Purchase Terms provides that Jabil should obtain prior written consent from GE to "transfer any work **_under this Order_** to another site[.]" Supply Agreement, Purchase Terms § 7 (emphasis added); *id.* § 1 (the Purchase Terms apply only to "purchases" and, thus, are incorporated *only* into Purchase Orders).  Similarly, Section 7 of the Purchase Terms provides that Jabil should obtain prior written consent from GE to "transfer any work under this Order to another site[.]" Supply Agreement, Purchase Terms § 7.  Absent purchase orders, which are not at issue here, there is no work to be performed and no work that could be improperly transferred to another site.  Even if Section 7 were to apply absent a purchase order for Pyramid Power Modules, the undisputed facts demonstrate that no such transfer happened.  The line and its personnel remained at Auburn Hills, and Jabil made its NPI team available to GE for continued discussions for the Pyramid Project.

And equally, GE's argument that Jabil failed or refused to meet GE's specifications for assembling Pyramid Power Modules—or failed or refused to assemble them—does not provide GE with a defense to Jabil's claim absent a purchase order.  Without a purchase order, Jabil was not obligated to assemble Pyramid Power Modules to certain specifications or even at all.

Moreover, this argument is wholly irrelevant to the question of whether GE must compensate Jabil for the Obsolete Raw Materials. Jabil's procurement of materials pursuant to GE's Forecasts and Jabil's assembly of Pyramid Power Modules are two very separate matters, triggering separate contractual terms and obligations. On one hand, under the Supply Agreement, Jabil's rights and obligations to procure materials—and its right to payment for them—arise upon the issuance of GE's Forecasts. Supply Agreement § 1(b), (c). On the other hand, any failure or refusal to meet GE's specifications for assembling Pyramid Power Modules depends entirely on whether GE chose to issue any additional purchase orders for products, which it was not obligated to do and—in fact—did not do. GE is liable for the Obsolete Raw Materials regardless of whether Jabil would be able to meet GE's qualifications on yet-to-be-ordered products secured only through placed purchase orders. Lastly, this argument ignores GE's testimony that it continually reassesses its supplier options and could at its discretion substitute suppliers for that project. GE Dep. 39:15-43:25. At any time after Jabil (allegedly) refused to meet GE's specifications for assembling Pyramid Power Modules, GE could have changed suppliers and used the materials in Jabil's possession that are now the subject of this lawsuit. Supply Agreement § 6(a). GE did not, continued to ignore Jabil's repeated warnings about the design of the Pyramid Power Modules,

and ultimately never brought the Pyramid Power Modules to market. Thus, any argument that Jabil's alleged failure to meet GE's specifications provides a defense to Jabil's claims finds no support in the Supply Agreement, in law, or in the undisputed material facts.

*Finally*, GE has waived these arguments by continuing its performance under the Supply Agreement. *King Fook*, 2016 U.S. Dist. LEXIS 197470, at *12. Under New York law, "upon learning of a breach, a party must choose between terminating the contract and continuing performance. If a party chooses to continue performance, it must give notice of breach to the other side, or it waives its right to sue the breaching party." *Id.* Not once did GE assert that Jabil was in material breach for any of the reasons that GE now asserts as "Defenses." In fact, rather than notifying Jabil that it was in material breach for any reason, GE instead opted to renew the Supply Agreement seven times and continue to perform thereunder for a range of projects under its various business units.[15] GE then waited over three-and-a-half years after the events giving rise to its supposed "Defenses" to assert them in this lawsuit as an excuse for its breach of the Supply Agreement. It, accordingly,

---

[15] In contrast, GE did provide Jabil notice of the "Dispute" regarding the Power Modules delivered to GE under the three Purchase Orders, and the parties subsequently settled and executed a mutual release regarding the Dispute and Purchase Orders. SUMF Ex. Z.

has waived any argument that Jabil's alleged conduct excuses its nonperformance. *King Fook*, 2016 U.S. Dist. LEXIS 197470, at *12; *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 416 (S.D.N.Y. 2007); *Times Mirror Mags.*, 103 F. Supp. 2d at 721.

> 3.    Jabil Is Entitled to Recover Both its Carrying and Storage Costs for the Obsolete Raw Materials

Jabil is also entitled, as a matter of law, to recover from GE its damages in the form of storage and carrying costs for the Obsolete Raw Materials.  The Supply Agreement requires that Jabil ship any "Obsolete Raw Materials paid for by [GE] . . . at [GE's] direction, risk and cost."  Supply Agreement § 6(a).  It follows that Jabil also was required to hold Obsolete Raw Materials for GE if, like here, GE becomes liable to purchase them from Jabil.  By standing ready to perform and segregating the Obsolete Raw Materials for GE, Jabil continues to incur damages not only in the form of storage costs, but also in the form of carrying costs.  These damages arise directly from GE's refusal to compensate Jabil for the Obsolete Raw Materials, and under New York law Jabil is entitled to recover them.  *Hudson Optical Corp. v. Cabot Safety Corp.*, No. 97-9046, 1998 U.S. App. LEXIS 22391, at *6 (2d Cir. Mar. 25, 1998) (noting that "the carrying cost and storage costs were recoverable under the breach of contract theory"); *Alfred Haroun & Sons v. U.S. Oil Corp.*, No. 92 CIV. 7223, 1994 U.S. Dist. LEXIS 16497, at *6 (S.D.N.Y. Nov. 17, 1994) (allowing

recovery of oil storage costs after breach).  Thus, this Court should award Jabil its carrying and storage costs in the amounts of $2,133,278.96 and $125,535.53, respectively.

### B.   Jabil Is Entitled to Summary Judgment on its Claim for Breach of the Settlement Agreement for the 55 Unreturned Pyramid Power Modules

There is no genuine dispute that, under the Settlement Agreement, GE agreed to return all the Pyramid Power Modules delivered to it under Purchase Orders Nos. 4500030834, 5400031288, and 4500033686 for a credit.  It is also undisputed that Jabil had delivered 354 Pyramid Power Modules to GE under these three Purchase Orders such that GE was bound to return each of these 354 Pyramid Power Modules. The undisputed facts also show that, despite Jabil's performance under the Settlement Agreement, GE has failed to return 55 Pyramid Power Modules. Moreover, the undisputed facts show that Jabil duly invoiced GE for their cost and that GE failed to honor these invoices.[16]  *Seiko Iron Works, Inc. v. Triton Builders Inc.*, No. 654220/2015, 2018 N.Y. Misc. LEXIS 93, at *4–7 (N.Y. Super. Ct. Jan. 10, 2018) (a plaintiff makes prima facie case for summary judgment it establishes it

---

[16] Aggravating matters, GE later sought to exploit its failure to compensate Jabil by conditioning payments for the unreturned Pyramid Power Modules on a full release of the claims Jabil now raises here, including for the Obsolete Raw Materials. Mullen Dec. ¶ 49; SUMF **Exhibit O**.

delivered materials that the defendant accepted and invoices remain unpaid).  GE's

failure to compensate Jabil for the unreturned Pyramid Power Modules, as a matter

of law, constitutes a material breach of the Settlement Agreement, and this Court

should grant summary judgment in Jabil's favor for their invoiced cost of

$192,225.00.

### C.      Jabil Is Entitled to Summary Judgment for an Award of Prejudgment Interest

Finally, Jabil is entitled to interest under New York law.  N.Y. C.P.L.R. §

5001(a) states that "[i]nterest shall be recovered upon a sum awarded because of a

breach of performance of a contract" and, thus, "mandates the award of interest to

verdict in breach of contract actions."  *Spodek v. Park Prop. Dev. Assoc.*, 759 N.E.2d

760, 762 (N.Y. 2001).  There is no genuine issue that GE breached its contractual

obligations to Jabil by failing to remit payment to Jabil for the Obsolete Raw

Materials or for the unreturned Pyramid Power Modules, Jabil is also entitled to

interest at the statutory rate of 9% per annum.  N.Y. C.P.L.R. § 5004 ("Interest shall

be at the rate of nine per centum per annum, except where otherwise provided by

statute."); *Siemens Westinghouse Power Corp. v. Dick Corp.*, 320 F. Supp. 2d 120,

121 (S.D.N.Y. 2004).  Interest began accruing on the unreturned Pyramid Power

Modules in October 2014 when some, but not all, of the subject modules were

returned.  Mullen Dec. ¶ 46.  Interest began accruing on the amounts for the Obsolete

Raw Materials, including carrying and storage costs by no later than January 1, 2017, the latest point at which point GE had no purchase order or Forecast demand for the next ninety days.  SUMF Ex. AO.

## V.   **CONCLUSION**

There is no genuine as to any material fact.  GE agreed and bound itself both to compensate Jabil for the damages it incurred in procuring the Obsolete Raw Materials to meet GE's Forecasts and to return to Jabil each of the 354 (not just 299) Pyramid Power Modules that Jabil had previously delivered.  Contrary to these contractual obligations, GE has refused not only to do so, but also to engage Jabil in good faith.  Based on this undisputed evidence, this Court should find, as a matter of law, that GE has breached the Supply Agreement and Settlement Agreement and that Jabil is entitled to the full amount of its damages and prejudgment interest. Therefore, Jabil respectfully requests that the Court grant this Motion for Summary Judgment and award Jabil damages in an amount of $4,580,032.40, plus prejudgment interest.

[Signature on Following Page]

35

Submitted this 18th day of December, 2020.

_/s/ David B. Carpenter_
Kristine McAlister Brown
Georgia Bar No. 480189
David B. Carpenter
Georgia Bar No. 292101
Alan F. Pryor
Georgia Bar No. 101888

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
T: (404) 881-7000
F: (404) 881-7777
kristy.brown@alston.com
david.carpenter@alston.com
alan.pryor@alston.com

**_Counsel for Plaintiff Jabil Inc._**

36

## **RULE 7.1D CERTIFICATE**

The undersigned hereby certifies that the foregoing Plaintiff Jabil Inc.'s Brief in Support of its Motion for Summary Judgment was prepared using 14-point Times New Roman font, in accordance with Local Rule 5.1B.

Dated this 18th day of December, 2020.

*/s/ David B. Carpenter*

David B. Carpenter
Georgia Bar No. 292101

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2020, a true and exact copy of Plaintiff Jabil Inc.'s Brief in Support of its Motion for Summary Judgment was filed with the Court using the CM/ECF system, which will automatically notify and serve all counsel of record.

*/s/ David B. Carpenter*
David B. Carpenter
Georgia Bar No. 292101