## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## (ATLANTA DIVISION)

JABIL Inc.,

              Plaintiff,

      -vs-                         1:19-cv-02260-LMM

GENERAL ELECTRIC COMPANY,

              Defendant.

----------------------------------------------------------x

## GENERAL ELECTRIC COMPANY'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Michael D. Fisse (Admitted *pro hac vice*)
Katy B. Kennedy (Admitted *pro hac vice*)
Paul R. Trapani, III (Admitted *pro hac vice*)
Daigle Fisse & Kessenich, PLC
227 Highway 21
Madisonville, Louisiana 70447
Telephone:  985-871-0800
Facsimile:  985-871-0899
Email:    mfisse@daiglefisse.com
          kkennedy@daiglefisse.com
          ptrapani@daiglefisse.com

Anthony C. Walsh (GA Bar No. 735063)
GE Gas Power
4200 Wildwood Parkway
Atlanta, Georgia  30339
Telephone:  678-844-6107
Email:    anthony.walsh@ge.com

***Attorneys for General Electric Company***

Defendant, the General Electric Company ("GE"), respectfully files this memorandum in support of its Motion for Partial Summary Judgment against Plaintiff, Jabil Inc. ("Jabil").  As detailed below, this Court should grant GE's Motion for Partial Summary Judgment and enter a ruling dismissing Jabil's claim for "Obsolete Raw Materials," leaving only Jabil's claim for recovery of payment for "Returned Modules" left for determination by this Court.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Jabil is seeking to recover the cost of raw materials that it purchased pursuant to alleged forecasts issued by GE.  Relying on the parties' Supply Agreement, Jabil claims that the receipt of alleged "forecasts" issued by GE authorized it to purchase the raw materials at issue, and Jabil further claims that changes in those alleged forecasts caused there to be "Obsolete Raw Materials" that GE is obligated to purchase from Jabil under the terms of the Supply Agreement.  Jabil's claim for the cost of the Obsolete Raw Material fails, however, because Jabil cannot satisfy the requirements for recovering Obsolete Raw Materials under the express terms of the Supply Agreement.[1]

---

[1]  Jabil has also made a so-called "Returned Modules" claim against GE in this action. *See* Complaint [Doc. 1] at 13-14.  This is a claim to recover payment for certain equipment components (modules) that GE allegedly agreed to purchase from Jabil. This Returned Modules claim is not affected by this summary judgment motion.

The GE/Jabil Supply Agreement concerned a project known as the Pyramid/MV4 project. This was a project that contemplated GE's production of certain power equipment components (or "modules") for industrial application and sale. For several reasons, the GE/Jabil Supply Agreement does not authorize Jabil's claim in this action for Obsolete Raw Materials.

First, GE agreed to purchase components from Jabil for the Pyramid/MV4 project on the express condition that Jabil would satisfy certain qualification standards to build this new product reliably and repeatedly. It is undisputed that Jabil never became qualified to build the MV4 product. In fact, Jabil withdrew from the GE qualification process and requested that GE evaluate alternate contract manufacturers for the qualification, production, and assembly of components for the Pyramid/M4 product. Under New York law, Jabil's failure to meet this condition bars Jabil, as a matter of law, from recovering against GE under the Supply Agreement as a matter of law.

Second, the Supply Agreement allows recovery for Obsolete Raw Materials only if Jabil can prove that the materials were purchased to satisfy _written_ Forecasts issued by GE. The Agreement defines "Forecasts" as those forecasts provided by GE to Jabil _in writing_. Jabil is only authorized to purchase raw materials upon receipt of written Forecasts. GE's liability for Obsolete Raw Materials is expressly conditioned and limited to purchases of raw materials made pursuant to such a

written Forecast.  The first written Forecast in evidence is dated October 16, 2014, yet Jabil seeks to recover for raw material it admits it began purchasing in late 2013. No written forecast issued by GE prior to October 16, 2014 is in evidence. The clear and unambiguous terms of the Supply Agreement provide that there can be no recovery for the alleged cost of Obsolete Raw Material purchased before October 16, 2014 without evidence of a written Forecast before that date.

Third, even if Jabil received earlier Forecasts to support its claims (for which there is no evidence), Jabil's Obsolete Raw Material claim still fails under the terms of the Supply Agreement.  Under the Supply Agreement, Jabil was authorized to purchase raw material pursuant to a written Forecasts only in quantities "as necessary to fulfill the Forecast on a current Component lead time plus manufacturing lead time basis."  The Supply Agreement also required Jabil to "place orders with Component suppliers for quantities no greater than is reasonably necessary to meet Buyer's Forecast." Jabil can, therefore, only recover for Obsolete Raw Materials if it can demonstrate that it bought the materials (i) "in accordance with [GE's] Forecasts (plus any minimum or economic order quantity purchase requirements), (ii) no sooner than reasonable appropriate to meet [GE's] delivery requirements," and (iii) not "in excess of the amount, or in advance of the time, necessary to meet [GE's] delivery schedule." Jabil bears the burden of showing that – on the date it purchased the Obsolete Raw Materials in question – the amount

3

purchased was consistent with both the written Forecasts and no more than needed to meet those Forecasts and the delivery schedule. The contract did not authorize Jabil to charge GE for raw materials that were purchased (for example) before the issuance of a Forecast or that were already within Jabil's inventory of materials before the issuance of a GE Forecast under the contract. Yet Jabil has produced zero of its purchase orders for the claimed Obsolete Raw Material, and it has not produced any other documentation regarding *when* it ordered any of the Obsolete Raw Material for which it now seeks payment from GE. Jabil cannot, therefore, meet its burden of proof in recovering for Obsolete Raw Material under the Supply Agreement, and this Court should dismiss the claim on that basis too.

## I.   FACTUAL BACKGROUND

### A.   The GE-Jabil Supply Agreement

Jabil has manufactured various electronic components designed by GE that are incorporated into products GE sells in the marketplace to its own customers pursuant to a Supply Agreement between the parties executed on 1 September 2011. *See* Exhibit A, Supply Agreement; *see also* Exhibit B, Deposition of Jabil (via Avis Mullen) at 58:1-9 (authenticating same). That Supply Agreement sets forth terms by which GE could purchase "any or all of the goods set forth that [GE] has agreed to purchase from [Jabil] . . . during the Terms of this Agreement . . . ." Exhibit A, Supply Agreement at § 1. Under the Supply Agreement, GE could provide Jabil

with "Forecasts" of its expected 12-month demand for the relevant GE's products. *See id.* at 1, section 1(b).  The Supply Agreement defines "Forecasts" as estimates provided to Jabil "**in writing**, on a monthly or quarterly basis."  *See id.* at 1, section 1(b) (emphasis added).

Jabil acknowledged in the Supply Agreement that GE's Forecasts "may not reflect [GE's] actual requirements," but the Forecast is, instead, "a best estimate only" with "no guaranteed number of Product that [GE] will purchase from [Jabil] . . ."  *See id.* at § 1(c).  Nevertheless, the Supply Agreement authorized Jabil to purchase raw material required to manufacture GE's products pursuant to the written Forecasts—but only in certain quantities "as necessary to fulfill the Forecast on a current Component lead time plus manufacturing lead time basis."  *See id.* Additionally, the Supply Agreement required Jabil to "place orders with Component suppliers for quantities no greater than is reasonably necessary to meet Buyer's Forecast."  *See id.*

Due to potential changes in demand, the Supply Agreement contained express provisions limiting when Jabil could recover from GE the costs for raw materials

purchased and ultimately not used to manufacture products sold to GE.  GE can only

be held liable for such "Obsolete Raw Materials"[2] subject to Jabil:

(1) having purchased the Obsolete/Excess Material only in support of GE's purchase orders or in accordance with GE's "Forecasts" (plus any minimum or economic order quantity purchase requirements) and **no sooner than reasonably appropriate** to meet GE's delivery requirements;

(2) **not having made production arrangements** or produced work-in-progress or inventory in excess of the amount, or **in advance of the time**, necessary to meet GE's delivery schedule; and

(3) having used all reasonable **efforts to mitigate any GE inventory liability**.

*See id.* at 5, section 6(c) (emphasis added).

## B.   The MV4 Project & the Complaint

On October 21, 2013, GE awarded Jabil with the Pyramid or "MV4" project.

*See* Exhibit C, Email from Christopher Bensing to Avis Mullen (dated Oct. 21,

2013); *see also* Exhibit I, Depo. of George Kunder at 183:11-184:13; 190:2-7

(authenticating same).  Because the MV4 project concerned a new product being

launched by GE for the first time (s*ee* Exhibit D, Depo. of Sawyers, at 48:10-24),

GE's award of the project was expressly conditioned upon, among other factors,

---

[2] Obsolete Raw Material is defined as "those raw materials in inventory or on order that no longer appear on a Buyer bill of material for the Products, or which appear on a bill of material for a Product for which Buyer has no purchase order or forecast demand during the next ninety (90) days."  *See* Exhibit A, Supply Agreement at § 6.a.

Jabil successfully completing the qualification process[3] to build the necessary power modules and cabinet boards.  *See* Exhibit C, Email from Christopher Bensing to Avis Mullen (dated Oct. 21, 2013).  Thereafter, Jabil began working on the MV4 project to supply the cabinet boards and power modules pursuant to the Supply Agreement.  *See* Exhibit B, Depo. of Jabil (Mullen) at 79:4-7.  It is undisputed, however, that Jabil was never qualified to build the power modules or cabinet boards.  By December 7, 2015, Jabil notified GE that Jabil would not "move forward any further with qualification of this product" and requested that GE "evaluate alternate contract manufacturers for the qualification/production and assembly of the Pyramid module."  *See* Exhibit F, Email from Mullen to Fitz-Gibbon (Dec. 7, 2015); Exhibit B, Depo. of Jabil (Mullen) at 212:3-16 (authenticating same).

On or around May 17, 2019, Jabil filed its Complaint [Doc. 1] in the above-captioned lawsuit.  Jabil has alleged that GE would provide Jabil "'Forecasts' (as defined under the Supply Agreement)" for its demand for certain power modules

---

[3] As explained by Jabil's Global Head of its Industrial Group, Scott Gebicke, that qualification process included the inspection and testing of Jabil's first, pilot builds to demonstrate that Jabil could reliably and repeatedly manufacture the power modules and cabinet boards pursuant to the GE's specifications.  *See* Exhibit E, Depo. of Gebicke at 128:18 – 130:2.  If Jabil cannot pass the qualification process, Jabil does not have authority to build the part.  *See id.* at 130:3-8.  As Jabil's corporate representative further explained, any purchase orders issued by GE will not get executed upon until Jabil becomes qualified to build a particular new product. *See* Exhibit B, Depo. of Jabil (Mullen) at 95:17 - 96:2.

and cabinet boards in 2014.  *See* Complaint [Doc. 1], ¶¶ 4, 26.  Jabil claims that upon receipt of those Forecasts, Jabil purchased raw materials to fulfill GE's demand, but GE subsequently reduced its demand, allegedly rendering $2.1 million in material Obsolete under the Supply Agreement.  *See id.,* ¶¶ 27-28.

Jabil claims that GE sent weekly forecasts to Jabil throughout 2014, starting as early as late 2013.  Jabil has only produced, however, two Forecasts for the MV4 project: the first dated October 16, 2014 and another dated January 29, 2015.  *See* Exhibit G, Forecast dated Oct. 16, 2014; Exhibit H, Forecast dated Jan. 28, 2015; *see also* Exhibit B, Depo. of Mullen at 87:2-9; 90:22 – 91:9 (authenticating same). GE's review of its own records similarly revealed that the first written Forecast issued to Jabil was the October 16, 2014 Forecast.  *See* Exhibit I, Depo. of GE (via George Kunder) at 78:10-20; 170:10 – 171:23.

Jabil's Global Head of its Industrial Group, Scott Gebicke, detailed the documentation that would flow between a customer (such as GE) and Jabil when Forecasts are issued as contemplated under the Supply Agreement.  Mr. Gebicke testified that Jabil would (1) receive a digital Forecast from the customer via email, (2) send a confirmation of the Forecast to the customer via email, and (3) await an email acceptance of that confirmation before purchasing raw material in accordance with the Forecast.  *See* Exhibit E, Depo. of Scott Gebicke at 52:6-16; 53:22-54:1. Jabil's Corporate Representative, Avis Mullen, confirmed this process during Jabil's

30(b)(6) deposition, testifying, "once we get the forecast from the customer . . . we then take the forecast and it is uploaded into SAP where we run an MPS report . . . and then [it is] provided back to - - to the customer." *See* Exhibit B, Depo. of Jabil at 51:9-18. None of that back-and-forth communications regarding Forecasts is evidenced by either Jabil's or GE's document production prior to the October 16, 2014 Forecast. *See* Exhibit I, Depo. of GE (Kunder) at 192:22 – 193:12.

Moreover, Jabil has not produced a single purchase order issued to its suppliers for any of the approximately $2.1 million in claimed Obsolete Raw Material. Instead, Jabil has produced a summary spreadsheet detailing certain information regarding the purchase orders it issued to its suppliers for the MV4 project. *See* Exhibit J, *in globo*, Jabil Purchase Order Spreadsheets (redacted); *see also* Exhibit B, Depo. of Jabil (Mullen) at 223:19 – 226:9 (authenticating same). Noticeably absent from those spreadsheets, however, is the date on which Jabil placed each purchase order. *See* Exhibit J, *in globo*, Jabil Purchase Order Spreadsheets. Incredibly, Jabil's corporate representative could not provide any information on the date of Jabil's purchase orders either, testifying that Jabil may somehow not maintain that information:

> Q:   And this spreadsheet that we're looking at now at Jabil 975 it doesn't have a column here that talks about when the purchase order was actually placed, correct?

*   *   *

A:      It does not.

Q:      Okay.  And that's certainly information that Jabil would have, correct?

A:      I am not sure about that.

Q:      Okay.  So you don't even know if Jabil keeps the date that it . . . issues its purchase orders?

A:      I'm not sure . . . if it keeps that information.

*See* Exhibit B, Depo. of Jabil (Mullen) at 246:25 – 247:15.

## II.   LAW AND ARGUMENT

### A.   Standard of Review

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260

(11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The

moving party's burden is discharged merely by "'showing'—that is, pointing out to

the district court—that there is an absence of evidence to support [an essential

element of] the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

Once the moving party has adequately supported its motion, the non-movant

then has the burden of showing that summary judgment is improper by coming

forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co.

v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  No "genuine [dispute] for trial"

exists when the record as a whole could not lead a rational trier of fact to find for the

nonmoving party. *Id.* (citations omitted).

### B.  Jabil Cannot Recover for Any Obsolete Raw Materials Because Jabil Never Satisfied the Condition of Becoming Qualified to Build the Power Modules.

The Supply Agreement is governed by New York law.  *See* Exhibit A, Supply

Agreement at § 13 & App'x 2, § 20. 34.  The elements of a cause of action to recover

for damages for breach of contract under New York law are: (1) the existence of a

contract; (2) the plaintiff's performance under the contract; (3) the defendant's

breach of that contract; and (4) resulting damages.  *See*, *e.g.*, *JP Morgan Chase v.

J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803 (N.Y. App. 2010).  It is well settled

under New York law that no action for breach of contract lies when the party seeking

to enforce the contract has failed to perform a specified condition.  *See Carr v.*

11

*Birnbaum*, 75 A.D.3d 972, 973 (N.Y. App. 2010) (prohibiting plaintiff from recovering for breach of contract because plaintiff did not meet the plain and unambiguous conditions of the contract). A party that fails to perform an obligation to fulfill a specified condition to the effectiveness of the contract cannot successfully prosecute a claim to enforce the contract. *Fahs Const. Group, Inc. v. State of N.Y.*, 123 A.D. 3d 1311, 1311 (N.Y. App. 2014). Even where fulfillment of the condition is not necessary to make the contract effective, the failure to fulfill it will relieve the other party of its obligation to perform under the contract. *PB Americas Inc. v. Continental Cas. Co.*, 690 F. Supp. 2d 242, 248 (S.D.N.Y. 2010). Summary judgment is proper in denying a claimant's breach of contract claim when the claimant has failed to meet a condition of the applicable contract. *See*, *e.g.*, *Group Fahs Constr., Inc. v. State of N.Y.*, 123 A.D.3d at 1311 (granting summary judgment where claimant failed to meet conditions of the underlying contract).

On 21 October 2013, GE awarded the MV4 project to Jabil. *See* Exhibit C, Email from Benson to Mullen (dated Oct. 21, 2013). In awarding the project to Jabil, GE outlined a number of conditions that Jabil must meet to move forward with producing the MV4 modules, including conditions related to target pricing, site quality, and the supplying of a team to support the manufacturing process. *See id.* Additionally, because the MV4 product was a brand-new, never-before-built product, GE noted the express condition that the "[p]arts must be qualified." *See id.*

As explained by GE's corporate representative, the qualification process is a defined process whereby the supplier must be able to demonstrate that the part can be made pursuant to the specifications and done so on a repeated basis.  *See* Exhibit I, Depo. of GE (Kunder) at 73:25 – 74:21; *see also*, *supra*, footnote 2.  Thus, the qualification process ensures that Jabil could build the MV4 product pursuant to GE's specifications.  *See* Exhibit I, Depo. of GE (Kunder) at 73:25 – 74:21 ("[A]s the qualification is completed, the supplier would have effectively met the specification . . . and that qualification defines that the [-] or confirms that the [-] specs are being met.").  Jabil accepted the award of the MV4 project and the express conditions stated therein.  *See* Exhibit C, Email from Mullen to Benson (dated Oct. 22, 2013).

The need to fulfill the qualification process is further emphasized in parties' Supply Agreement, the terms of which were applicable to the MV4 project.  The Supply Agreement expressly provides that "Seller will manufacture the Product in accordance with the Specifications and any applicable Purchase Orders . . . ."  *See* Exhibit A, Supply Agreement, § 1(e).   As GE's corporate representative testified, the qualification process and the need to meet the product specifications are one and the same:  "[A]s the qualification is completed, the supplier would have effectively met the specification . . . and that qualification defines that the [-] or confirms that the [-] specs are being met."  *See* Exhibit I, Depo. of GE (Kunder) at 73:25 – 74:21.

Like the plaintiff in *Carr*, it is undisputed that Jabil never fulfilled the express condition of becoming qualified to build the MV4 product. Instead, Jabil chose to remove itself from the qualifications process. *See* Exhibit B, Depo. of Jabil (Mullen) at 213:20-25; *see also* Exhibit F, Email from Mullen to Fitz-Gibbon (dated Dec. 7 2015). In its communication to GE, Jabil noted that it "cannot move forward any further with qualification of this product, and Jabil respectfully requests GE to evaluate alternate contract manufacturers for the qualification/production and assembly of the Pyramid module." *See* Exhibit F, Email from Mullen to Fitz-Gibbon (dated Dec. 7, 2015). Therefore, because Jabil never met the pre-condition of becoming qualified to build the MV4 product, Jabil is precluded, as a matter of law, from recovering the alleged Obsolete Materials.

## C. Jabil May Not Recover for Any Obsolete Raw Materials Not Purchased Pursuant to a Written Forecast.

Pursuant to the express terms of the Supply Agreement, Jabil may only recover for Obsolete Raw Materials to the extent they were purchased pursuant to a *written* Forecast. "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide." *Global Telesystems, Inc. v. KPNQwest, N.V.*, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001). When the agreement is unambiguous, a court may not admit extrinsic evidence and, instead, interprets the plain language of the agreement as a matter of law. *Kamfar v. New World Rest. Grp., Inc.*, 347 F.Supp.2d 38, 48–49 (S.D.N.Y. 2004) (internal footnote omitted); *see also RJE*

*Corp. v. Northville Indus. Corp.,* 329 F.3d 310, 314 (2d Cir.2003) ("Where a 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.' " *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010); *see also Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir. 2000) ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument.").  A court "should not, under the guise of contract interpretation, imply a term which the parties themselves failed to insert or otherwise rewrite the contract." *Aivaliotis v. Cont'l Broker-Dealer Corp.*, 817 N.Y.S.2d 365, 366 (N.Y. App. Div. 2006) (internal quotations omitted). If the contract is unambiguous, summary judgment is appropriate.  *See Omni Quartz, Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir.2002) ("The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment.").

In *Keiler v. Harelquin Enterprises Ltd.*, 751 F.3d 64 (2d Cir. 2014) (applying New York law), the U.S. Court of Appeals for the Second Circuit emphasized the enforcement of the contract pursuant to the defined terms therein.  In *Keiler*, the relevant publishing agreements granted the "Publisher" the exclusive rights to the applicable works throughout the world.  *See id.* at 66-67.  The publishing agreements defined "Publisher" as either Harlequin Enterprises B.V. ("HEBV") or Harelequin

Books S.A. ("HBSA").  *See id.* at 66-67.  Thereafter, Harlequin Enterprises Limited ("Harlequin") began selling and licensing the relevant works directly to consumers as a licensee of HEBV/HBSA.  *See id.* at 67.  Several authors then filed a putative class action against Harlequin, claiming that they should receive royalties based upon the net amount received by Harlequin directly—as opposed to a percentage of the amount received by HEBV/HBSA from their licensing agreement with Harlequin.  *See id.*  In short, Plaintiffs claimed that Harlequin should be recognized as the "Publisher" under the publishing agreements when calculating royalty payments.  *See id.* at 68.

The district court held that the contractual definition of "Publisher" under the publishing agreement "was binding" and refused to re-write the contract to allow Harlequin to be the "Publisher" under the agreements.  *See id.*  The Second Circuit affirmed, noting that the publishing agreements unambiguously defined "Publisher" as HEBV or HBSA.  *See id.* at 69.  The Second Circuit further dismissed Plaintiffs' contention that Harlequin Enterprises was the actual Publisher given the parties' course of dealings:  "…New York law is well settled that a written agreement that is complete and unambiguous is to be interpreted without the aid of extrinsic evidence and that industry practice may not be used to vary the terms of such a contract." *See id.* at 69 (citing *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458 (2d Cir. 2010); *Croce v. Kurnit*, 737 F.2d 229 (2d Cir. 1984)).

The same rationale applies here.  The Supply Agreement unambiguously defines "Forecasts" as those forecasts provided by GE to Jabil "*in writing*."  *See* Exhibit A, Supply Agreement, § 1(b) (emphasis added).  Pursuant to the Supply Agreement, only those defined "Forecasts" authorized Jabil to purchase materials in quantities necessary to fulfill them on a current lead time plus manufacturing lead time basis.  *See id.*, § 1(c).  Further, GE's liability for any Obsolete Raw Material is expressly dependent, in part, upon Jabil having purchased those raw materials in accordance with the defined "Forecasts."  *See id.*, § 6(c).  Therefore, under the terms of the Supply Agreement, Jabil is not entitled to obtain damages for any raw materials not purchased pursuant to a written Forecast.  Allowing Jabil to do so would improperly re-write the terms of the parties' contract.  *Aivaliotis v. Cont'l Broker-Dealer Corp.*, 817 N.Y.S.2d 365, 366 (N.Y. App. Div. 2006).

Jabil and GE have both independently searched their records and produced the same two written Forecasts—an October 16, 2014 and a January 28, 2015 Forecast.  GE has searched its records and does not have any Forecasts (written or otherwise) issued to Jabil for the MV4 project before October 16, 2014, and Jabil has admitted that it also does not have any written Forecasts before October 16,

17

2014. *See* Exhibit B, Depo. of Jabil (Mullen) at 98:14-18; *see* Exhibit I, Depo of George Kunder at 78:10-20; 170:10 – 171:23.[4]

The non-existence of any Forecasts issued by GE to Jabil prior to October 16, 2014 is also evidenced by the complete lack of documentation that Jabil testified would follow upon receipt of a Forecast from GE. Specifically, Mr. Gebicke testified that upon receiving a Forecast, Jabil would send a confirmation to the customer and await acceptance of that confirmation before purchasing raw material in accordance with the Forecast. *See* Exhibit E, Depo. of Scott Gebicke at 52:6-16; 53:22-54:1. Jabil's Corporate Representative confirmed this process, testifying, "once we get the forecast from the customer . . . we then take the forecast and it is uploaded into SAP where we run an MPS report . . . and then [it is] provided back to - - to the customer." *See* Exhibit B, Depo. of Jabil at 51:9-18. We should expect, therefore, Jabil and/or GE to have (in addition to a written Forecast) confirmation emails between GE and Jabil regarding any such pre-October 2014 Forecasts. Yet neither GE nor Jabil have any such documentation—further demonstrating that no Forecasts were provided to Jabil before the October 2014 Forecast. *See* Exhibit I, Depo. of GE (Kunder) at 192:22 – 193:12; Exhibit E, Depo. of Gebicke at 52:25 – 53:8.

---

[4] As explained by GE's corporate representative, prior to October 2014, GE and Jabil work working under discreet purchase orders, which have since been settled. *See* Exhibit I, Depo. of GE (Kunder) at 95:10-22.

The lack of pre-October 16, 2014 Forecasts is fatal to Jabil's claim for any Obsolete Raw Materials purchased by Jabil before that date.  Courts regularly enforce writing requirements when mandated under the contract.  *See*, *e.g.*, *Korea Life Ins. Co. v. Morgan Guaranty Trust Co of N.Y.*, 99-12175, 2004 WL 1858314, *6 (S.D.N.Y. 8/20/2004) ("[W]here written notice is required anything derogates from that written notice must be in writing as well."); *Prompt Elec. Supply Co. v. Allen-Bradley Co.*, 492 F. Supp. 344, 347-48 (E.D.N.Y. 1980) (granting defendant's motion for summary judgment because plaintiff could not produce evidence of a written notice of defect as required under the contract); *Cullman Ventures Inc. v. MSS Assocs. Inc.*, 1996 WL 807772 (N.Y. Sup. Ct. 1996) (dismissing defendant's counterclaim on summary judgment and disregarding defendant's prior oral notices of defects because the contract required all notices to be in writing).  Indeed, writing requirements within contracts serve an important function—namely to ensure that disputes are "not relegated to swearing contests" between the parties.  *See*, *e.g.*, *In re Mason Hill & Co.*, No. 95-99999, 2004 WL 2659579, *6 (S.D.N.Y. 10/18/2004) (quoting *Modern Settings, Inc. v. Prudential-Bach Secs., Inc.*, 936 F.2d 640 (2d Cir. 1991) (internal quotations omitted).

By requiring Jabil to demonstrate that it purchased raw material pursuant to a written Forecast, the Supply Agreement expressly contains terms by which GE and Jabil could avoid a "swearing match" regarding the existence and substance of any

Forecast underlying an Obsolete Raw Material claim.  *See* Exhibit I, Depo. of GE

(Kunder) at 191:3 – 192:1.  As Mr. Kunder testified:

> As a practical matter, [the writing requirement for Forecasts is] to make sure that wee – well, to avoid situations like this.  The written forecast is established such that there's a record of whatever signal is being provided to the supplier as opposed to word of mouth, phone call, hearsay, et cetera, but it's established it must be written so that we can have that record which then we subsequently attach or should be attached to a supplier procurement system, and ERP, et cetera, as their evidence that that's what they were acting upon and that was the signal that they received.

*See id.* at 191:3-18.

Because Jabil has not produced any written Forecasts provided by GE for the

MV4 project before October 16, 2014, Jabil cannot recover any damages related to

raw materials it purchased before October 16, 2014.  GE is entitled, therefore, to a

judgment as a matter of law dismissing Jabil's claim for any Obsolete Raw Material

purchased before October 16, 2014.  As noted below, however, Jabil has failed to

produce any evidence of *when* it purchased the Obsolete Raw Materials, so Jabil's

Obsolete Raw Material claim fails *in toto*.  *See*, *infra*, Section II.D.

## D. __Jabil Has Failed to Produce Evidence Regarding When It Purchased the Alleged Obsolete Raw Materials.__

Jabil must, under the Supply Agreement, also prove that it purchased any

Excess or Obsolete Raw Material no sooner than reasonably appropriate to meet

GE's delivery requirements and not in advance of the time to meet GE's delivery

schedule.  *See* Exhibit A, Supply Agreement, § 6(c).  Accordingly, the precise date

when Jabil ordered the raw materials is critical to its ability to recover for alleged Obsolete Raw Material under the Supply Agreement.  Because Jabil cannot offer such evidence, GE is entitled to summary judgment dismissing Jabil's claims for that raw material.

The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *DiCola v. SwissRe Holding (North America), Inc.,* 996 F.2d 30 (2d Cir.1993)).  When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.  *See id.* (citing *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988)).  "There are many ways in which a defendant moving for summary judgment can satisfy the burden of showing entitlement to judgment." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 115 (2d Cir. 2017). Among them, defendant may, prior to moving for summary judgment, "make a discovery demand requiring plaintiff to reveal the evidence that supports an essential element of the plaintiff's case." *See id.*  If the plaintiff, in response, fails to show evidence capable of sustaining the plaintiff's burden of proof on that element, then the defendant can prevail on its motion, as provided in Rule 56(c)(1)(A), by "citing

to [those] particular parts of materials in the record" that demonstrate the insufficiency of plaintiff's evidence.  *See id.*

Here, GE propounded discovery to Jabil expressly requesting, among other information, the date that Jabil purchased the various raw materials at issue in this matter:

**INTERROGATORY NO. 3:**

Please provide the following information concerning all of the Components and Materials (including without limitation the "Obsolete Raw Materials" alleged in your Complaint) that you claim to have purchased under the Supply Agreement:

(a) Identify each of the different Components and Materials by providing their names, descriptions, characteristics, qualities, and any identifying part, component, or material numbers;

(b) State the quantity or amount of each of the different Components and Materials;

(c) State the price you paid for each of the different Components and Materials, and the date(s) that each of the different Components and Materials were purchased by you;

(d) State the date(s) that each of the different Components and Materials were delivered to you;

(e) Identify the person who was the vendor or supplier of each of the different Components and Materials; and

(f) State the reason or the basis for Jabil's claim that the Components and Materials are "Obsolete" as alleged in your Complaint.

In response, Jabil agreed to produce documents containing the information responsive to this document request.  *See* Exhibit K, Jabil Responses to GE Discovery, Answer to Interrogatory No. 3.  Similarly, GE requested the production of all documents identifying the date on which it purchased the Obsolete Raw

Material, including the applicable purchase orders, to which Jabil responded,

agreeing to produce same:

**REQUEST FOR PRODUCTION NO. 18:**

   **Please produce all documents which state or identify the dates on which you purchased Components and Materials that Jabil claims to have purchased to satisfy GE Forecasts as alleged in your Complaint. This Request includes without limitation purchase orders, bills, invoices, receipts, cancelled checks, and other records of purchase or payment.**

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

   Jabil objects to Request No. 18's call for Jabil to produce "all documents" as overbroad, unduly burdensome, and not proportional to the needs of this case. Subject to, without waiver of, and as limited by the foregoing, Jabil will conduct reasonable searches of the records maintained in the ordinary course of Jabil's business and will produce responsive, relevant documents to the extent they exist in its possession, custody, and control at a mutually agreeable time and place and after the Court has entered an appropriate protective order.

*See id.*, Jabil's Response to Request for Production No. 18.

   Jabil never produced, however, *any* of its purchase orders related to the

claimed Obsolete or Excess Raw Materials.   Instead, Jabil produced two

spreadsheets itemizing, among other information: (1) Jabil's purchase order number

for various components; (2) the supplier of the components; (3) the manufacturer of

the components; (4) and the quantity ordered.   *See* Exhibit J, *in globo*, Jabil

Spreadsheets, Bates labeled 975-976.   Missing entirely from this summary evidence

was the critical evidence of *when* Jabil placed any of those purchase orders.   *See id.*

Indeed, Jabil's corporate representative testified that not only do these spreadsheets not contain the date when the purchase orders were placed, but Jabil is not even aware whether it keeps that information at all:

> Q:    [T]his spreadsheet that we're looking at now at Jabil 975[,] it doesn't have a column here that talks about when the purchase order was actually placed, correct?
>
>                        *     *     *
>
> A:    It does not.
>
> Q:    Okay.  And that's certainly information that Jabil would have, correct?
>
> A:    I am not sure about that.
>
> Q:    Okay.  So you don't even know if Jabil keeps the date . . . that it issues its purchase orders?
>
> A:    I'm not sure . . . if it keeps that information.

*See* Exhibit B, Depo. of Jabil (Mullen) at 246:25 – 247:15.

Aside from the incredible assertion that Jabil does not maintain the date of the issuance of its purchase orders, the evidence produced by Jabil cannot, as a matter of law, satisfy its burden of proof to recover for Obsolete Raw Material under the Supply Agreement.  Even if Jabil could demonstrate that GE provided Jabil with the alleged Forecasts (which GE expressly denies), Jabil is only permitted to recover for Obsolete Raw Material if it can demonstrate that it did not purchased that material in advance of the time to meet GE's delivery schedule.  *See* Exhibit A, Supply

24

Agreement, § 6(c).  To properly determine if Jabil can meet that burden, one would need (at the very least) to analyze the dates on which Jabil purchased the Obsolete Raw Materials in comparison to the delivery schedule outlined in the alleged Forecasts themselves.  Based upon the documents produced in discovery, it is impossible for GE and this Court to perform that analysis.  Without that critical evidence, Plaintiff cannot meet its burden of proof, and this Court should grant summary judgment on Jabil's Obsolete Material claim.

## III.   CONCLUSION

In sum, Jabil's claim for Obsolete Raw Materials under the Supply Agreement fails as a matter of law.  Jabil never satisfied the express condition that it be qualified to manufacture the MV4 modules; so, under New York law, Jabil is not entitled to the relief sought under the Supply Agreement.  Further, not only has Jabil not produce any written Forecasts authorizing it to purchase the Obsolete Raw Material before October 16, 2014, but Jabil has not produced any evidence for *when* it ordered that Obsolete Raw Material, thereby precluding any meaningful analysis of whether it has purchased the raw material in compliance with the terms of the Supply Agreement.

Jabil asserts a claim for $2.1 Million worth of Obsolete Raw Material that it alleges it purchased to manufacture the new MV4 product for GE.  GE's long-standing contract with Jabil – predating the agreement concerning the new MV4

Product – expressly provides that GE could only be liable to Jabil for Obsolete Raw Material that Jabil purchased in response to a written Forecast from GE, and then only in an amount that was necessary for Jabil to manufacture the products called for by the Forecast on the schedule required by GE.

Jabil claims that there were written Forecasts starting in late 2013 and continuing through 2014 for the MV4 Product but can produce no such Forecasts dated earlier than October 2014 – despite its witnesses' testimony regarding the document-intensive nature of the forecast and order process.  And Jabil has produced no evidence of when it purchased the material in question, or why those purchases were necessary to meet the written Forecasts from GE that it also cannot produce.  What the document record does show is that, no later than December 7, 2015, Jabil abandoned its efforts to qualify to produce the MV4 Product – thus (so the Jabil argument goes) rendering the materials in question "obsolete" regardless of what any alleged GE Forecasts did or did not say.

GE is not liable for purchases made by Jabil unless it can show that those purchases were made pursuant to written Forecasts and that the purchases were in the amount necessary for Jabil to manufacture the products called for by the Forecast on the schedule required by GE.  Jabil can show neither of those things.  Regardless, it was not GE's actions that rendered this material "obsolete;" it was Jabil's unilateral decision to abandon its efforts to qualify as a manufacturer.  Jabil may well have

good business reasons for making that decision, but it cannot, as a matter of law, hold GE liable for purchases it made prior to that decision.

Accordingly, GE requests this Court to grant GE's Motion for Partial Summary Judgment and dismiss Jabil's claim for Obsolete Raw Material in full.

Respectfully submitted,

*/s/ Anthony C. Walsh*
Anthony C. Walsh (GA Bar No. 735063)
GE Gas Power
4200 Wildwood Parkway
Atlanta, Georgia  30339
Telephone:  678-844-6107
Email:        anthony.walsh@ge.com

and

Michael D. Fisse (Admitted *pro hac vice*)
Katy B. Kennedy (Admitted *pro hac vice*)
Paul R. Trapani, III (Admitted *pro hac vice*)
Daigle Fisse & Kessenich, PLC
227 Highway 21
Madisonville, Louisiana 70447
Telephone:  985-871-0800
Facsimile:  985-871-0899
Email:        mfisse@daiglefisse.com
                 kkennedy@daiglefisse.com
                 ptrapani@daiglefisse.com

**Attorneys for General Electric Company**

## **CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the above and foregoing has been served upon all counsel of record by electronic notice in accordance with Local Rules to those counsel receiving electronic notice, and all others by depositing same in the United States Mail, postage prepaid and properly addressed, this 18th day of December, 2020.

*/s/ Anthony C. Walsh*
Anthony C. Walsh

## **RULE 7.1 CERTIFICATE**

I do hereby certify that that this Motion has been prepared using Times New Roman 14-point font pursuant to Local Rule 5.1.

This 18th day of December 2020.

*/s/ Anthony C. Walsh*
Anthony C. Walsh