IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JABIL INC., | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:19-CV-02260-LMM |
| | : | |
| GENERAL ELECTRIC COMPANY, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ORDER

Plaintiff Jabil Inc. ("Jabil") sued Defendant General Electric Company ("GE") in May 2019, alleging that Defendant breached two contracts between the parties. The case proceeded to a bench trial on March 27, 2023. The parties subsequently submitted proposed findings of fact and conclusions of law and responded to one another's submissions. Dkt. Nos. [153–56]. After due consideration of the evidence presented, the Court issues the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### A. Parties & Claims

1. Jabil is a manufacturing services company that provides electronic and diversified manufacturing services and solutions throughout the world.

2. GE is a manufacturing company operating in industries like aviation, gas, and energy production.

3. On September 1, 2011, Jabil (then operating as Jabil Circuit, Inc.) and GE executed the parties' Supply Agreement, in which Jabil agreed to perform manufacturing services to provide GE with certain "Products."

4. On October 21, 2013, GE selected Jabil for the "Pyramid Project" to construct certain Products, including "Power Modules" and "Cabinet Boards."

5. After disputes regarding some Power Modules that Jabil made for GE in the Pyramid Project, the parties entered into a Settlement and Mutual Release Agreement (the "Settlement Agreement") on September 28, 2014.

6. Jabil brought two breach of contract claims in this case arising out the Pyramid Project. First, Jabil claims that GE breached the parties' Supply Agreement by refusing to pay Jabil the quoted costs of certain materials that Jabil purchased in reliance on written Forecasts issued

by GE during the Pyramid Project (the "Materials"). Second, Jabil claims that GE breached the Settlement Agreement by failing to return 55 missing Power Modules to Jabil (or to otherwise compensate Jabil for them). In the Court's Summary Judgment Order, it determined that GE owed Jabil for 35 Power Modules but found a genuine issue of material fact regarding 20 Power Modules; therefore, only the outstanding 20 Modules are at issue here.

**B. The Supply Agreement**

1.  The Supply Agreement set forth terms by which Jabil could manufacture, and GE could purchase, certain Products. But it did not specify which Products would be manufactured and purchased, nor did it mandate that GE would purchase particular Products, or a particular quantity of Products, from Jabil.

2.  Instead, the Supply Agreement stated, "All purchases under this Agreement are subject to the issuance of firm purchase orders" from GE. Dkt. No. [149-2] § 1(a).

3.  The Supply Agreement also provided that GE "shall provide [Jabil] a forecast that shall be updated by [GE], in writing, on a monthly or quarterly basis ('Forecast')." Id. § 1(b). These Forecasts were only meant to be a "best estimate" of GE's Products requirements, which "may not reflect [GE's] actual requirements for Products." Id. § 1(c).

There was "no guaranteed number of Products" that GE would purchase from Jabil under the Agreement or the Forecasts. Id.

4. Forecasts authorized Jabil "to purchase Components . . . and materials, including any minimum order quantities, as necessary to fulfill the Forecast on a current Component lead time plus manufacturing lead time basis." Id. Thus, Forecasts allowed Jabil to begin preparing Products for GE based on expected demand.

5. Jabil was to "place orders with Component suppliers for quantities no greater than [was] reasonably necessary to meet [GE's] Forecast." Id.

6. If Jabil purchased more materials than necessary to meet GE's needs, the Supply Agreement provided two liability provisions for "Obsolete Raw Materials" and "Excess Raw Materials." Id. § 6(a)–(b). First, it defined "Obsolete Raw Materials" as "raw materials in inventory or on order that no longer appear on a [GE] bill of material for the Products, or which appear on a bill of material for a Product for which [GE] has no purchase order or forecast demand during the next ninety (90) days." Id. § 6(a). Second, the Supply Agreement defined "Excess Raw Materials" as "raw materials that have aged in [Jabil's] inventory for more than ninety (90) days from receipt." Id. § 6(b).

7. After the Obsolete or Excess Raw Materials exceeded certain thresholds, the Supply Agreement required Jabil to notify GE of the

surplus. GE would then have the option to place a new purchase order to consume the Materials or to remit a payment to Jabil for them.

8.   GE's payment for Obsolete or Excess Raw Materials triggered Jabil's obligation to ship them "at [GE's] direction, risk and cost." Id. § 6(a)–(b).

9.   GE was only required to pay for the Obsolete and Excess Raw Materials that Jabil purchased in accordance with purchase orders or Forecasts "no sooner than reasonably appropriate to meet [GE] delivery requirements" after Jabil had "used all reasonable efforts to mitigate any [GE] inventory liability . . . in consultation with and with the assistance of [GE]." Id. § 6(c). Jabil also could not make production arrangements or works in progress sooner than necessary to meet GE's delivery schedule.

10.  Finally, Appendix 2 to the Supply Agreement—incorporated with the Agreement—provided, "UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER . . . FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES . . . ." Id. at app. 2 § 10.

## C. The Pyramid Project

1.   In October 2013, GE selected Jabil for the Pyramid Project. The Supply Agreement governed the parties' relationship in the Pyramid Project.

5

2.  Avis Mullen is a Senior Business Unit Director at Jabil. She was responsible for overseeing Jabil's relationship with GE as a Business Unit Manager from 2008 through 2019. She served as Jabil's main point of contact on the Pyramid Project.

3.  Ms. Mullen worked with Scott Gebicke, who served as the head of Jabil's Industrial Group during the relevant period.

4.  GE's main contact was Chris Bensing, who joined the Pyramid Project as Category Manager and ultimately became the Project Leader.

5.  Other GE employees on the Pyramid Project included Anthony Pica, Robert Eley, and Jose Fitz-Gibbon.

6.  The parties' current dispute centers on how GE drove Jabil's production for this project: Jabil claims that GE sent it written Forecasts periodically from December 2013 until 2015 and that Jabil ordered parts based on the expected demand reflected in those Forecasts; GE insists that it only provided purchase orders, not Forecasts. The distinction is significant because Plaintiff seeks to recover for Materials that it purchased pursuant to written Forecasts.

7.  As Ms. Mullen explained at trial, Forecasts authorized Jabil to purchase the components needed to build a Product, while purchase orders allowed Jabil to build the actual Product itself. She also stated that Forecasts were important because otherwise Jabil would not

have the components needed to build the final Product on time.

8. On the other hand, Mr. Bensing testified that GE only sent purchase orders, not Forecasts, to drive Pyramid Project demand. But the Court does not find his testimony credible on this point; he did not recall many interactions with Jabil, including Forecast emails that he sent and received, and he made small, misleading distinctions between Forecasts and purchase orders, even in the face of documentary evidence to the contrary. Therefore, based on the evidence discussed below, the Court finds that GE drove its Pyramid Project demand through written Forecasts, not solely through purchase orders, as Mr. Bensing claimed.

9. Ms. Mullen received the first written Forecast in late 2013, and GE continued to send Forecasts via email through 2014 and into 2015. Jabil claimed that it could not produce those emails at trial because of a two-year document retention policy.

10. Still, Jabil did present some excerpts of emails containing Forecasts, which GE produced in discovery, showing monthly forecasted demand for Power Modules in 2014. In one email, dated November 13, 2013, Mr. Pica from GE sends a chart to Mr. Bensing and Ms. Mullen with a chart that lists quantities of Power Modules by month from January through June 2014.

11. And in an email from December 10, 2013, Mr. Bensing states, "I have one further update to the forecast with our spares requirements included. Please consider all previous forecasts obsolete and use this going forward." Dkt. No. [150-8]. He then includes a chart indicating GE's forecasted demand for Power Modules from December 2013– June 2014.

12. Ms. Mullen testified that the timing and format of these emails in the record matched other written Forecasts that she received from GE via email for the Pyramid Project.

13. Additionally, Jabil and GE employees used an action tracker for the Pyramid Project, which shows that Mr. Bensing and Mr. Pica were responsible for providing Forecast data to Jabil by December 2013. In the tracker presented at trial, that task was marked as completed, further supporting Jabil's claim that GE sent Jabil written Forecasts for the Pyramid Project as early as December 2013.

14. Jabil tracked GE's demand through its SAP system. The SAP system incorporates data from Forecasts, shipments, vendors, and other sources about Jabil customer orders. Based on that data, the SAP system informs Jabil employees of when to place orders with suppliers based on the component and manufacturing lead times (the time needed to meet the customer's delivery demands).

15. The SAP data Jabil provided does not show the source documents for

8

the data contained, meaning that it does not indicate whether the data came from Forecasts, purchase orders, or other sources. At trial, however, Jabil employees demonstrated how certain SAP data matched demand from GE Forecasts.

16. Jabil's SAP system indicates that, as GE revised its Forecasts throughout 2014, it both increased the quantity and shortened the time frame of its forecasted demand. For instance, as of the week of January 27, 2014, Jabil's SAP system reflected GE's forecasted demand for 1,198 Power Modules to be delivered over the course of 11 months.  However, as of the week of June 23, 2014, Jabil's SAP system reflected GE's forecasted demand for 1,397 Power Modules to be delivered over the course of 6 months. See Dkt. No. [150-4].

17. By July 2014, GE had issued three purchase orders for Power Modules at a price of $3,495.00 each.

18. Between March and August 2014, Jabil assembled and delivered 354 Power Modules to GE.

19. Afterwards, GE issued an updated Forecast in October 2014, which reduced GE's forecasted demand.

20. This Forecast left Jabil with extra Materials in inventory. Jabil employees, including Ms. Mullen, informed GE about this inventory via email.  For example, in December 2014, Ms. Linda Pearce (a Jabil employee) emailed Mr. Bensing stating that "Jabil is sitting on a great

deal of inventory that will still need to be consumed once production does resume" and that "the forecast . . . is very low volume through calendar Q2 and into Q3." Dkt. No. [149-20] at 1. In response, Mr. Bensing wrote, "Beyond what we have forecasted, we should consider 50 modules/week" to "burn through the inventory." In his email, Mr. Bensing did not ask why Jabil had so much material or object to Ms. Pearce's mention of GE's Forecasts. Id.

21. In January 2015, Jabil received an updated Forecast from Mr. Eley at GE, which further delayed GE's forecasted demand. After the January 2015 Forecast, GE did not provide Jabil another Forecast in connection with the Pyramid Project.

22. In late 2015, Ms. Mullen exchanged emails with GE employee Jose Fitz-Gibbon about a potential commercial resolution for the extra Pyramid Project Materials that Jabil still held and other related matters.

23. In these communications, Jabil provided a spreadsheet detailing its Excess and Obsolete Raw Materials inventory, tracked by Jabil's SAP system. In its response, GE did not state, object, or otherwise advise that GE did *not* issue written Forecasts or that Jabil did not meet its obligations under the Supply Agreement when it bought the Materials.

24. By 2017, GE had no forecasted demand for Power Modules or Cabinet

Boards, and GE never sent a purchase order to buy or otherwise consume the extra Materials still in storage at Jabil sites.

25. The evidence shows that Jabil purchased all of these Materials pursuant to forecasted delivery dates and quantities provided by GE. Jabil policies and procedures ensured that Materials were not purchased sooner than reasonably appropriate to meet GE's expected demand throughout the Pyramid Project because Jabil used a just-in-time inventory system.

26. Without any additional demand, Jabil was left with about $2.6 million in extra Pyramid Project inventory.

27. Jabil notified GE of this extra inventory and the cost to GE. Jabil then sought to reduce its inventory and mitigate GE's liability for the Pyramid Project by selling Materials to third parties, reallocating Materials to other Jabil customers, and cancelling orders.

28. Jabil eventually reduced its Pyramid Project inventory to $2,128,992.91.

29. Jabil still stores the remaining inventory at its Guadalajara and Auburn Hills locations.

30. Ms. Mullen testified that from January 1, 2016 through March 27, 2023, Jabil incurred $171,119.08 in storage costs for the Pyramid Inventory at its Guadalajara site and continues to incur additional storage costs at a rate of $64.77 per day. She also testified that from

January 1, 2016 through March 27, 2023, Jabil incurred $11,894.21 in storage costs for the Pyramid Inventory at its Auburn Hills site and continues to incur additional storage costs at a rate of $4.50 per day.

31. Ms. Mullen then testified that Jabil has incurred carrying costs from its capital being tied up in the Materials. Applying Jabil's weighted average cost of capital of 15% to the Materials from January 1, 2016 through March 27, 2023 and compounding annually, she claimed that Jabil has been deprived of a total of $3,731,993.39 in carrying costs. Jabil did not provide any other evidence on this issue. As discussed further below, the Court finds that this testimony alone is insufficient to establish Jabil's storage and carrying costs.

## D. The Settlement Agreement

1. On September 28, 2014, Jabil and GE entered into the Settlement Agreement to address a dispute regarding Power Modules that Jabil had sent GE in the Pyramid Project.

2. The Settlement Agreement covered Power Modules that GE requested in three Purchase Orders (Nos. 4500030834, 4500031288, and 4500033686) and included a liability release relating to those Purchase Orders.

3. The parties agreed that GE would return all 354 Power Modules at issue to Jabil for a credit, which Jabil provided.

4. Despite this obligation, GE returned only 299 Power Modules and

has not compensated Jabil for the 55 outstanding Power Modules. GE claims that it never received the missing Modules.

5. Ms. Mullen confirmed that Jabil shipped all 354 Power Modules to GE by pulling shipping information, carrier information, and serial numbers for each of the 354 Power Modules. She even considered the weights of each shipment to verify the number of units sent. Therefore, the record indicates that GE is responsible for the 20 missing Modules as well.

6. As noted above, in the Court's prior Order, it granted Jabil's Motion for Summary Judgment for 35 of the outstanding 55 Modules, requiring GE to compensate Jabil for them. Therefore, only 20 Power Modules are at issue.

## CONCLUSIONS OF LAW

### A. Standard of Proof

1. The standard of proof in a civil bench trial is a preponderance of the evidence. See Johnson v. Florida, 348 F.3d 1334, 1347 (11th Cir. 2003); Fire Ins. Exch. v. McCoy, 637 F. Supp. 2d 991, 992 (M.D. Ala. 2009). A plaintiff bears the burden of satisfying the finder of fact that it has proven every element of its claim by a preponderance of the evidence. McCoy, 637 F. Supp. 2d at 992. "The burden of showing something by a preponderance of the evidence . . . requires the trier of fact to believe that the existence of a fact is more probable than its

nonexistence before [s]he may find in favor of the party who has the burden to persuade the judge of the fact's existence." <u>Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.</u>, 508 U.S. 602, 622 (1993) (cleaned up).

**B. New York Law**

1.   The Supply Agreement and Settlement Agreement both contain choice of law provisions stating that those contracts shall be governed and construed according to New York state law, excluding New York's conflicts of laws rules. Dkt. No. [149-2] at app. 2 § 20; Dkt. No. [149-8] § 8. The parties' choice of law is enforceable, so New York law governs this dispute. <u>See</u> <u>Ministers & Missionaries Benefit Bd. v. Snow</u>, 45 N.E.3d 917, 922–23 (N.Y. 2015).

2.   Under New York law, "[t]he essential elements of a cause of action to recover damages for breach of contract are (1) the existence of a contract, (2) the plaintiff's performance pursuant to the contract, (3) the defendant's breach of its contractual obligations, and (4) damages resulting from the breach." <u>Arnell Constr. Corp. v. N.Y.C. Sch. Constr. Auth.</u>, 41 N.Y.S. 101, 103 (N.Y. App. Div. 2016); <u>see also</u> <u>34–06 73, LLC v. Seneca Ins. Co.</u>, 198 N.E.3d 1282, 1287 (N.Y. 2022).

3.   The Court now considers whether Jabil proved each of these elements, first in relation to the Supply Agreement, followed by evaluation of its Settlement Agreement claim.

**C. GE's Breach of the Supply Agreement**

1. There is no dispute that the Supply Agreement is a valid, enforceable contract; therefore, the Court's analysis begins with the second element: whether Plaintiff performed its Supply Agreement obligations.  Dkt. No. [144] ¶¶ 7, 10.

*i. Jabil's Performance*

2. Based on the evidence presented at trial, the Court concludes that Jabil met its contractual obligations under the Supply Agreement. This conclusion is based on three primary facts: (1) Jabil received written Forecasts from GE; (2) Jabil ordered Materials pursuant to those Forecasts in quantities no larger than, and no earlier than, reasonably appropriate to meet GE's forecasted demand; and (3) Jabil mitigated its damages in accordance with the Supply Agreement.

3. The evidence shows that Jabil received written Forecasts from GE as early as December 2013 and that Jabil ordered Materials pursuant to those Forecasts no sooner than reasonably appropriate to meet GE's requirements. Dkt. No. [149-2] §§ 1(b), 6(c). Jabil used four sources of evidence for this proposition: (1) testimony from Ms. Mullen, (2) email excerpts containing Forecasts, (3) a Pyramid Project action tracker, and (4) data from Jabil's SAP system.

4. Before discussing this evidence, the Court recognizes that neither party could locate Forecasts from before October 2014 in their

records. Ms. Mullen testified that, despite her efforts, she could not find the written Forecasts that she testified about receiving from GE because Jabil has a two-year email retention policy. The Court concludes that Jabil was unable to produce certain documents relating to the Pyramid Project—including the written Forecasts from GE—due to its document retention policy and not in bad faith. <u>See</u> Fed. R. Evid. 1004 ("An original is not required and other evidence of the content of a writing . . . is admissible if . . . all the originals are lost or destroyed, and not by the proponent acting in bad faith."); <u>see also</u> Dkt. No. [135] (denying GE's request to exclude evidence about the lost emails). Thus, the testimony and other records received in evidence constitute valid secondary evidence regarding the written Forecasts that Jabil received from GE. <u>See</u> <u>United States v. Ross</u>, 33 F.3d 1507, 1513–14 (11th Cir. 1994) ("Once the terms of Rule 1004 are satisfied, the party seeking to prove the contents of the recording . . . may do so by any kind of secondary evidence.").

5.  *First*, Ms. Mullen testified that she received written Forecasts from GE via email, beginning in late 2013. Ms. Mullen's testimony was credible and detailed, and she had a strong recollection of events relating to the Pyramid Project. Moreover, her position at Jabil and involvement in the Pyramid Project made her an appropriate contact for receiving

Forecasts and gave her firsthand knowledge of many facets of the Project.

6. Jabil also introduced evidence of two written Forecasts that Mr. Pica and Mr. Bensing sent to Jabil via email in November and December 2013, respectively. At trial, Ms. Mullen confirmed that the timing, format, and appearance of Plaintiff's Exhibits 24 and 25, Dkt. Nos. [150-8, 150-9], were consistent with the written Forecasts for the Pyramid Products that she received from GE.

7. Further, Jabil and GE employees used an action tracker for the Pyramid Project, which Jabil introduced at trial. The tracker shows that Mr. Bensing and Mr. Pica were responsible for providing Forecast data to Jabil by December 2013 and that the task was marked as completed, providing further evidence that GE sent Jabil written Forecasts, in accordance with the Supply Agreement. Dkt. No. [150-7].

8. Finally, Jabil's SAP data indicates that GE sent written Forecasts for the Pyramid Project in 2013 and 2014. Ms. Mullen testified about the SAP data and Jabil's practices and procedures regarding the SAP system. She authenticated data taken from Jabil's SAP system reflecting the written Forecast information that Jabil personnel received from GE for the Pyramid Project and input into Jabil's SAP system.

9.  Ms. Mullen detailed Jabil's mandatory processes and procedures regarding Forecast data and the SAP system as follows: (1) after receiving a written Forecast from GE, Jabil employees confirmed the data with GE; (2) Jabil employees uploaded the Forecast data into Jabil's SAP system; and (3) Jabil confirmed the Forecast data entered into SAP with GE.  She testified that Jabil followed those processes and procedures in connection with the Pyramid Project.

10. GE asserts that Jabil did not follow this procedure, but the Court disagrees based on the testimony from Jabil employees at trial. For example, Mr. Gebicke testified that following the company's processes and procedures is "actually essential" and that the "[b]usiness wouldn't exist if we didn't do that." Dkt. No. [147] at 228. He claimed that anyone who input data into SAP without a Forecast would "be fired instantly because [of] the amount of liability it would put on the company." Id. at 229. He then stated, "[T]here's no incentive to actually do that. There's no reason for anyone to ever do that. We only order what the customer wants at the appropriate customer lead teams, period, number one [rule]." Id. at 229–30.

11. Furthermore, Jabil's SAP data for the Power Modules in particular (Material GE201026639) mirrors the written Forecast provided by GE on December 10, 2013 for the months of January, February, and March of 2014. For example, the data shows that following the receipt

of the Forecast shown in Plaintiff's Exhibit 24, Dkt. No. [150-8], Jabil input GE's forecasted demand for Power Modules for January, February, and March in the SAP system, which match Plaintiff's Exhibit 24. Thus, the Court finds the SAP data reliable.

12. GE correctly states that the SAP data does not distinguish between Forecasts and purchase orders. GE contends that this is significant because Jabil's claim is about Materials purchased pursuant to Forecasts, and GE argues that it drove demand exclusively through purchase orders, not with written Forecasts. To support this contention, GE offered testimony from Mr. Bensing. But Mr. Bensing merely stated that he did not "recall sending weekly forecasts." Dkt. No. [148] at 22. He also testified that he did not recall the emails that he sent and received regarding Forecasts, which Jabil presented at trial. Id. at 26. As noted above, the Court is not persuaded by Mr. Bensing's testimony; his demeanor, body language, and responses to questions—including frequently being unable to recall certain interactions—all indicated that he was not comfortable with his testimony.

13. In contrast to Mr. Bensing, Mr. Gebicke clearly explained the necessity of Forecasts:

> Q: Could the authority to purchase those materials come in the form of a purchase order without a forecast?

> A: That would never happen. It would be a firm
> forecast. . . . .
> Q: And so why would you still get a forecast in that
> scenario?
> A: Because the lead times of the materials are so
> long . . . . So you have to scope out in order to get a
> product delivered 18 months from now you have to have
> that forecast that shows exactly everything you need on a
> weekly and monthly schedule.

Dkt. No. [147] at 222. Furthermore, evidence from the SAP system matched Forecasts provided at trial, indicating that the SAP data reflects demand and orders made pursuant to Forecasts, rather than purchase orders.

14. Together, this evidence shows by a preponderance of evidence that Jabil received written Forecasts from GE beginning in late 2013 and used those Forecasts to drive demand in the Pyramid Project.

15. *Second*, having established that Jabil received written Forecasts from GE, the Court next turns to whether Jabil ordered Materials in accordance with those Forecasts, only as reasonably necessary to meet GE's demand, as the Supply Agreement requires. The Court finds that Jabil has also proven this fact by a preponderance of the evidence.

16. Jabil need not prove the dates on which it purchased the Materials or show that it only purchased them as strictly necessary; instead, Jabil is only required to show that it purchased Materials "in accordance with [GE's] Forecasts" "in quantities no greater than is reasonably

necessary" and "no sooner than reasonably appropriate" to meet GE's demand. Dkt. No. [149-2] §§ 1(c), 6(c).

17. Ms. Mullen testified about Jabil's practices and procedures for ordering raw materials, which require a "just-in-time" inventory system. Dkt. No. [147] at 55–61. The SAP system used GE's Forecast data to calculate the expected future demand date and quantity for Power Modules and Cabinet Boards. The SAP system then indicated to Jabil's purchasing teams when the necessary time to order Materials was, based on component and manufacturing lead times. Jabil's purchasing teams would only order Materials in accordance with SAP data. Thus, Materials were only purchased when reasonably necessary to satisfy GE's demand.

18. Mr. Gebicke also testified about the just-in-time inventory system. He described it as essential to Jabil's business and stated that if a Jabil employee deviated from Jabil's purchasing practices and procedures— such that material was *not* purchased on a just-in-time basis—the employee would be fired. Dkt. No. [147] at 218–21, 229–30. He also testified that both Jabil's SAP system and its practices and procedures are routinely audited to ensure the system's integrity. Id. at 227–29.

19. Accordingly, Jabil's SAP data, coupled with the testimony from Ms. Mullen and Mr. Gebicke and other credible record evidence, is sufficient to prove by a preponderance of the evidence that Jabil

properly procured the Materials in accordance with the requirements of the Supply Agreement.

20. *Third*, Jabil must also show that it used all reasonable efforts to mitigate GE's liability. The Court finds that Jabil also proved this element by a preponderance of the evidence.

21. The record evidence and testimony demonstrate that, following GE's decision not to place additional purchase orders for Power Modules or Cabinet Boards after September 2015, Jabil actively sought to reduce GE's inventory liability by, for example, selling Materials to third parties and reallocating Materials to other Jabil customer projects. E.g., Dkt. No. [149-11].

22. Ms. Mullen testified that Jabil reduced the Materials—and thereby mitigated GE's inventory liability—by approximately $500,000 from December 2014 to March 2023. Dkt. No. [147] at 114–15. In total, Jabil reduced the Materials inventory from about $2.6 million to $2,128,992.91.

23. GE contends that the Jabil should have scrapped the Materials to mitigate its damages, but as Jabil notes, the Supply Agreement required Jabil to store and maintain the Materials until GE issued purchase orders to consume the Materials or paid Jabil the quoted cost of the Materials, neither of which occurred here. Section Six of the Supply Agreement provides specific terms for handling Excess and

Obsolete Raw Materials and does not mention scrapping Materials. Dkt. No. [149-2] § 6. Thus, the Court will not construe the contract to impose additional obligations on the parties. <u>Georgitsi Realty, LLC v. Penn-Star Ins. Co.</u>, 702 F.3d 152, 155 (2d Cir. 2012) ("[T]he court 'may not write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction, nor may it construe the language in such a way as would distort the contract's apparent meaning.'" (quoting <u>In re Matco-Norca, Inc.</u>, 802 N.Y.S.2d 707, 709 (N.Y. App. Div. 2005))).

24. Accordingly, the Court finds that Jabil fulfilled its obligations to mitigate its damages from the excess and obsolete GE inventory. Thus, Jabil satisfied the second element of its claim by proving that it performed its Supply Agreement obligations.

*ii. GE's Breach*

25. Next, the Court finds that GE breached the Supply Agreement. GE's Forecasts lapsed, no purchase orders to consume the Materials were forthcoming, and by January 1, 2017, the Materials "appear[ed] on a bill of materials for a Product for which [GE] ha[d] no purchase order or forecast demand during the next ninety (90) days." Dkt. No. [149-2] § 6(a); Dkt. No. [149-4]. The Materials, therefore, constituted Obsolete Raw Materials under the Supply Agreement and triggered GE's payment obligations under Section 6(a). Because GE failed to pay Jabil

for the Materials or place purchase orders to consume them, GE breached the Supply Agreement.

26. Notably, GE does not contend that it did place purchase orders or make Jabil payment offers for the Materials; GE instead focuses its argument on allegations that Jabil did not satisfy its Supply Agreement obligations, which the Court has already discussed above.

*iii. Damages*

27. Jabil bears the burden of showing the amount of damages suffered because of GE's breach. Under New York law, Jabil must prove those damages by "a reasonable certainty" with valid evidence—not simply with conjecture, speculation, or general assumptions. E.g., City of N.Y. v. New York, 801 N.Y.S. 2d 8, 11 (N.Y. App. Div. 2005); Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1010 (2d Cir. 1991) (applying New York law).

28. First, Jabil has submitted credible, competent evidence of its damages for the quoted cost of the Materials.  The trial record contains information directly from Jabil's SAP system that details the type, quantity, location, and cost of the Materials that Jabil still holds for the Pyramid Project in its Auburn Hills and Guadalajara facilities. Dkt. No. [149-9]. Jabil maintained this data in the ordinary course of its business, which the Federal Rules of Evidence consider reliable and trustworthy because businesses are incentivized to keep accurate

records. <u>See, e.g.</u>, <u>United States v. Veytia-Bravo</u>, 603 F.2d 1187, 1189, 1191 (5th Cir. 1979); <u>United States v. Warner</u>, 638 F. App'x 961, 963–64 (11th Cir. 2016).

29. The Court is further persuaded by corroborating evidence and the testimony at trial. For instance, Ms. Mullen testified that Jabil audited the Materials and verified the quantities and costs of the Materials at both the Auburn Hills and Guadalajara facilities. Jabil then supported this testimony with spreadsheets sent to GE, which conveyed the same descriptions, quantities, locations, and costs for the Materials. <u>See</u> Dkt. Nos. [149-9, 149-10, 149-21].

30. There is no evidence in the record that suggests that GE questioned Jabil's inventory of surplus Materials.

31. Thus, the Court finds that Jabil has carried its burden to prove damages for the extra Materials totaling $2,128,992.91.

32. But the Court finds that Jabil did not submit competent evidence to show the valuation of its damages for storage and carrying costs.

33. The only evidence that Jabil provided on this point at trial was Ms. Mullen's testimony about the storage rates and carrying costs based on conversations with Jabil's finance director, who did not testify. Unlike other areas about which she testified, Ms. Mullen had limited knowledge on this issue:

Q: Did you do anything personally to calculate that information about what the storage cost was—well start first with Guadalajara?

A: I did not.

Q: Do you know what anyone would have done to calculate those storage costs at the Guadalajara facility?

A: Yes. We have to pay for storage space, I believe, there[,] and they used whatever they would do. I don't know the details, but they did provide me with the information. . . .

Q: And you didn't do anything personally to develop what the storage cost at the Auburn Hills facility would be; correct?

A: No. We've got financial people, and operations people to do that.

Q: And so you can't testify about what they did or didn't do with respect to getting those numbers; correct?

A: Not exactly, no.

Dkt. No. [147] at 191–92.

34. Although Ms. Mullen testified extensively, and credibly, about many aspects of Jabil's business of which she had personal knowledge, her limited testimony about the storage and carrying costs was not sufficient without any further evidence. See Dkt. No. [147] at 116–18. Jabil did not even provide any documents to Ms. Mullen when discussing these costs. Without any supporting evidence, the Court finds that Jabil is not entitled to damages for storage and carrying costs.[1]

---

[1] Because the Court finds that Jabil did not carry its burden on these damages, the Court need not address the parties' dispute regarding whether storage and carrying costs are recoverable under the Supply Agreement. Dkt. No. [153] ¶¶ 76–79; Dkt. No. [156] ¶¶ 76–79.

35.  In sum, Jabil proved that it performed its Supply Agreement obligations, that GE breached the Agreement, and that Jabil suffered $2,128,992.91 in damages because of the breach. The Court finds that Jabil did not meet its burden to recover damages for its storage and carrying costs.

## D. GE's Breach of the Settlement Agreement

1.  In the parties' 2014 Settlement Agreement, they decided that Jabil would issue a credit to GE for the Power Modules that were delivered under Purchase Orders Nos. 4500030834, 5400031288, and 4500033686 and that GE would return those 354 Power Modules to Jabil.  Dkt. No. [149-8] at 1; Dkt. No. [98] at 27–31.

2.  As explained above, the parties disputed whether GE returned 55 of the 354 Modules, which GE claims it never received. In its Summary Judgment Order, the Court determined that Jabil was entitled to summary judgment on its claims regarding 35 of the Power Modules but found a genuine issue of material fact regarding the remaining 20 Modules—namely, whether GE had ever received those specific Modules. Dkt. No. [98] at 27–31. At issue now are only those 20 Modules.

3.  The elements for this breach of contract claim are the same: (1) there was a valid, enforceable contract; (2) Plaintiff performed its obligations under the contract; (3) Defendant breached the contract;

and (4) Plaintiff suffered damages from this breach. <u>Arnell Constr. Corp.</u>, 41 N.Y.S. at 103; <u>34–06 73, LLC</u>, 198 N.E.3d at 1287.

4. Again, there is no dispute that the Settlement Agreement is a valid, enforceable contract. Thus, the Court begins with the second element: whether Jabil performed its Settlement Agreement obligations.

*i. Jabil's Performance*

5. At trial, Ms. Mullen credibly testified—based on her firsthand knowledge—that Jabil delivered all 354 Power Modules to GE, despite GE's insistence that it never received 20 of those Modules. Dkt. No. [147] at 120–24.

6. Ms. Mullen testified that she individually confirmed the weights of each shipment to ensure that Jabil had shipped all 354 Power Modules to GE, which is supported by record evidence. Dkt. No. [149-13]. She also testified that she examined shipping and carrier information, packing list numbers, and serial numbers for all of the Modules. Thus, the Court finds that Jabil provided sufficient evidence to demonstrate it fulfilled its Settlement Agreement obligations.

*ii. GE's Breach*

7. Ms. Mullen is equally credible in her testimony that Jabil credited GE for 354 Power Modules and that Jabil received only 299 Power Modules.  Therefore, Jabil performed its obligations under the Settlement Agreement by issuing GE a credit for the invoiced price for

the 354 Power Modules, but GE failed to satisfy its obligation to return all 354 Power Modules to Jabil.  By failing to return or otherwise compensate Jabil for the 55 Power Modules at issue—GE breached the Settlement Agreement.

*iii. Damages*

8.  To recover damages from this breach, Jabil must prove its damages to "a reasonable certainty" with valid evidence—not simply with conjecture, speculation, or general assumptions. <u>E.g.</u>, <u>City of N.Y.</u>, 801 N.Y.S. 2d at 11.

9.  GE does not contest the price of the Power Modules at $3,495.00 each. Dkt. No. [147] at 123–24; Dkt. No. [149-14]. Jabil requests $192,225.00 in damages for all 55 Power Modules. Dkt. No. [154] at 35–36. In its Order on Summary Judgment, the Court determined that Plaintiff was entitled to $122,325.00 at that time, and the Court now finds that Jabil is entitled to $69,900.00 for the 20 outstanding Modules, for a total of $192,225.00. Dkt. No. [98] at 31.

## E. Prejudgment Interest

1.  New York Civil Practice Law & Rules § 5001(a) states that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract," N.Y. C.P.L.R. § 5001(a) (McKinney 2023), and thus "mandates the award of interest to verdict in breach of contract actions." <u>Spodek v. Park Prop. Dev. Assocs.</u>, 759 N.E.2d 760,

761–62 (N.Y. 2001). Accordingly, Jabil is entitled to an award of prejudgment interest at the statutory rate of 9% for its breach of contract claims here.[2] N.Y. C.P.L.R. § 5004; <u>Siemens Westinghouse Power Corp. v. Dick Corp.</u>, 320 F. Supp. 2d 120, 121 (S.D.N.Y. 2004).

2. Interest began accruing on the Supply Agreement damages for the extra Materials on January 1, 2017—the latest point at which GE had no purchase order or Forecast demand for the next ninety days. Dkt. No. [149-4] at 2. Thus, GE is to pay Jabil $2,128,992.91, plus 9% per annum prejudgment interest, on Jabil's Supply Agreement claim.

3. Interest began accruing on the Settlement Agreement damages for the unreturned Modules on October 1, 2014, when GE returned 299 of the Power Modules. Thus, GE is to pay Jabil the full $192,225.00 for the 55 unreturned Modules, plus 9% per annum prejudgment interest, on Jabil's Settlement Agreement claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court enters judgment in Jabil's favor on both of its breach of contract claims. The Court also finds, however, that Jabil failed to meet its burden of proof for damages relating to its storage and carrying

---

[2] GE does not contest Jabil's Proposed Findings of Fact and Conclusions of Law regarding prejudgment interest, nor did GE include any proposed findings or conclusions relating to prejudgment interest.

costs. Accordingly, the Court determines that Jabil is entitled to damages in the amounts of:

1. **$2,128,992.91** for the cost of the Materials in Jabil's inventory;

2. **$192,225.00 in total** for the 55 credited Power Modules—not to be counted twice with the damages assessed in the Summary Judgment Order [98]; and

3. **Prejudgment interest** at a rate of 9% per annum, accruing from January 1, 2017 for the Materials and from October 1, 2014 for the Power Modules.

At trial, the Court deferred ruling on GE's oral motion for judgment under Federal Rule of Civil Procedure 52(c). For the same reasons discussed above, the Court denies GE's motion. To the extent that the Court did not discuss any other deferred rulings, the Court did not rely on them in its decision.

The Clerk is **DIRECTED** to **CLOSE** this case.

**IT IS SO ORDERED** this 13th day of September, 2023.

**Leigh Martin May**
**United States District Judge**